The **FIRST NATIONAL BANK OF CHICAGO** et al., **Plaintiffs-Appellants,**

v.

**Elliot RICHARDSON, Attorney-General of the United States, et al., Defendants-Appellees.**

No. 73-1573.

United States Court of Appeals, Seventh Circuit.

Argued July 30, 1973.

Decided Sept. 13, 1973.

**1370**

Calvin P. Sawyier, Lois Lasky, Chicago, Ill., for plaintiffs-appellants.

James R. Thompson, U. S. Atty., William T. Huyck, John B. Simon, James C. Murray, Jr., and Floyd Babbitt, Asst. U. S. Attys., Chicago, Ill., for defendants-appellees.

Robert S. Cushman, Chicago, Ill., for Chicago Central Area Committee, amicus curiae.

George M. Covington, Chicago, Ill., John Howard Association, National Council on Crime and Delinquency, and Illinois Prisons and Jails Project, amici curiae.

Before KILEY, FAIRCHILD and SPRECHER, Circuit Judges.

SPRECHER, Circuit Judge.

The issue on appeal is whether the construction of the partially-completed federal parking garage and detention center in Chicago should be enjoined pending the preparation of a detailed environmental impact statement or whether the General Services Administration (GSA) has satisfied the requirements of the National Environmental Policy Act of 1969 (NEPA) by issuing a detailed "environmental assessment" intended to show that this "major Federal action" is not one "significantly affecting the quality of the human environment."

Inasmuch as the construction of the Chicago detention center and the litigation it has engendered have closely followed in time and pattern, the construction of, and litigation resulting from, a similar federal detention center in New York City which caused the Court of Appeals for the Second Circuit to give extensive consideration to most of the issues involved here, we shall note the factual and procedural similarities and differences in the two situations in some detail. This is particularly appropriate because the district court, this court, and all parties proceeded with one eye on the New York case as it developed in Hanly v. Mitchell, 460 F.2d 640 (2d Cir. 1972), cert. denied, 409 U.S. 990, 93 S. Ct. 313, 34 L.Ed.2d 256 (1972) (*Hanly I*), and Hanly v. Kleindienst, 471 F.2d 823 (2d Cir. 1972) (*Hanly II*).

I

The New York project, known as the Foley Square Courthouse Annex (Foley Square) consists of two buildings each approximately 12 stories high with a total of 345,601 gross square feet, one an office building for the staffs of the United States Attorney and Marshal and the other a detention center known as Metropolitan Correction Center.

Noting that not all agency action requires the preparation of an impact statement, the court in *Hanly I* stated that "the responsible federal agency has the authority to make its own threshold determination as to . . . [whether the federal action is 'major' and also has a 'significant' effect on the environment] in deciding whether an impact statement is necessary." *Hanly I*, 460 F.2d at 644. On the basis of a short memorandum by

GSA that tersely discussed problems of water, heat, sewage and garbage and concluded that the "impact of the proposed action will have no adverse effects on the environment, including ecological systems, population distribution, transportation, water or air pollution, nor will it be any threat to health or life systems or urban congestion," the Court of Appeals affirmed the district court's denial of a preliminary injunction, holding that the memorandum was sufficient to support GSA's determination that the *office building* in Foley Square would have no adverse effects on the environment. *Hanly I*, 460 F.2d at 645–646.[1]

However, the detention center, the Foley Square "jail," was viewed as distinct from the office building determination. GSA had attempted to justify the detention center on the basis of the same abrupt memorandum which had satisfactorily terminated environmental attacks on the office building, but the Court of Appeals reversed the district court's denial of preliminary injunctive relief, holding that as to the detention center, "in the context of an act de-signed to require federal agencies to affirmatively develop a reviewable environmental record, this perfunctory and conclusory language simply does not suffice, even for purposes of a threshold section 102(2)(C) determination." *Hanly I*, 460 F.2d at 647.[2] The court stated that GSA must at least consider those factors peculiar to detention centers which have an impact on the urban environment. *Hanly I*, 460 F.2d at 646–648.

The Chicago project, known as the United States Courthouse Annex and Federal Parking Facility (Chicago Annex), consists of one triangular-shaped 27-story building with an area of approximately 180,000 gross square feet for the detention center and a second rectangular 8-story, open-sided building with an area of approximately 315,000 gross square feet for the parking garage for about 850 automobiles.

In the present case, the GSA at first relied upon a 4-stage statement similar in length and content to the Foley Square memorandum to satisfy the

---

1. The *Hanly II* court articulated more fully the factors underlying this holding as follows:

    "The office building would not differ substantially from the makeup of the surrounding area. Nor would it in absolute terms give rise to sizeable adverse environmental effects. Most of the employees occupying the building would merely be transferred from the existing Courthouse where the newly created space will be used primarily for courtrooms and desperately needed office space for court personnel."

    *Hanly II*, 471 F.2d at 832.

2. Section 102(2)(C) (42 U.S.C.A. § 4332 (Cum.Supp.1973)) provides:

    "The Congress authorizes and directs that, to the fullest possible: . . . (2) all agencies of the Federal Government shall—

    \* \* \* \* \*

    "(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;. . . ."

threshold determination that the Chicago Annex was not one significantly affecting the quality of the human environment. The district court originally denied the plaintiffs' motion for a preliminary injunction on March 30, 1973, but we directed the vacation of that order on April 26, 1973 in appeal No. 73–1324 and in our order of that date disposed of three defenses which had been interposed by the governmental defendants: we held (1) that the plaintiffs (two Chicago banks, the Union League Club of Chicago, two not-for-profit citizens' planning organizations and an individual) had standing to sue under Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) by virtue of their "use" of the area to be affected by the construction of the Chicago Annex; (2) that "[a]lthough the plaintiffs could have brought this action earlier than they did," we declined to invoke laches because of "the public interest status accorded ecology preservation by the Congress," in accordance with Arlington Coalition on Transportation v. Volpe, 458 F.2d 1323, 1329 (4th Cir. 1972); and (3) that the fact that one plaintiff bank which later withdrew from the case had been recalcitrant with respect to answering interrogatories did not detract from the right of the other plaintiffs to maintain the action.

As the Second Circuit did in *Hanly I,* we remanded the case to the district court with directions to enter an injunction effective in no less than 30 days unless in the interim GSA supplemented its threshhold environmental impact assessment and the court upon a hearing determined that it was adequate. If such assessment was not adequate, an injunction was to be entered and continued in force until an environmental impact statement was made in full compliance with Section 102(2)(C) of NEPA.

The district court entered an order on May 7, 1973, enjoining further construction of the Chicago Annex as of 5:00 P. M. on May 26, 1973. In that interim, GSA invited and received objections to the construction based upon environmental effects and after consideration of these and other factors filed on May 15 a 142-page supplemental environmental assessment supported by a large number of exhibits. GSA considered the supplemental data and on May 17 made its determination "that construction and operation of the U. S. Courthouse Annex and Federal Parking Facility is not considered to be a major federal action that would significantly affect the quality of the human environment."

The plaintiffs had submitted letters, statements and other documentary material to GSA, which were included in the GSA exhibits supporting the assessment. The assessment and exhibits were introduced in evidence when the district court held its hearing on May 21 and 22, at which time the plaintiffs called 5 witnesses.

On May 25, the district court denied the plaintiffs' motion for a preliminary injunction and, in effect, vacated the May 7 order providing for an injunction effective May 26. In a 38-page memorandum opinion, Judge McGarr made findings and conclusions and adjudged that the GSA determination as to the lack of significant environmental impact of the Chicago Annex project (1) was consistent with the requirements of the National Environmental Policy Act of 1969, Executive Order 11514 flowing therefrom and the Guidelines of the Council on Environmental Quality on Statements on Proposed Federal Actions Affecting the Environment, Circular No. A–95 Revised (February 9, 1971) and (2) "was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law or without observance of procedure required by law."

A subsequent hearing on plaintiffs' application for a permanent injunction was held on June 19, 1973, wherein the evidence received in support of the motion for preliminary relief was considered and the plaintiffs called 5 additional witnesses. On June 22 the court made additional findings and conclusions and denied the plaintiffs' motion for a permanent injunction, as well as reaf-

firming his judgment regarding the GSA determination.

The plaintiffs appealed from the district court's denial of their motion to alter and amend the memorandum opinion of May 25, 1973, denying a preliminary injunction, and from the June 22 order denying a permanent injunction.

## II

After remand in *Hanly I* a new threshold determination of lack of significant effect on the quality of the human environment was made by GSA in the form of a 25-page assessment of environmental impact with some exhibits attached. The district court then denied plaintiffs' renewed application for a preliminary injunction and the *Hanly II* appeal followed.

In the majority opinion, written by Judge Mansfield, the Court of Appeals held that although a court reviewing administrative action must determine *de novo* all questions of law, must determine whether factual findings are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law" (Administrative Procedure Act § 10(e), 5 U.S.C. § 706(2)(A) and (D)), and must accept the administrative agency's decisions as to mixed questions of law and fact if they have "warrant in the record" and a "reasonable basis in law" (NLRB v. Hearst Publication, Inc., 322 U.S. 111, 131, 64 S.Ct. 851, 88 L.Ed. 1170 (1944)), the arbitrary and capricious standard should apply to NEPA exemption determinations since "significantly" as used in Section 102(2)(C) can be isolated as a question of law (Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)). *Hanly II*, 471 F.2d 823, 828–829.

In discussing the proper interpretation of the term "significantly," the Court noted a complete lack of Congressional or administrative guidelines, stating that:

"Congress apparently was willing to depend principally upon the agency's good faith determination as to what conduct would be sufficiently serious from an ecological standpoint to require use of the full-scale procedure."

*Hanly II*, 471 F.2d at 830. The majority opinion then concluded that "in deciding whether a major federal action will 'significantly' affect the qualify of the human environment the agency in charge, although vested with broad discretion, should normally be required to review the proposed action in the light of at least two relevant factors: (1) the extent to which the action will cause adverse environmental effects in excess of those created by existing uses in the area affected by it, and (2) the absolute quantitative adverse environmental effects of the action itself, including the cumulative harm that results from its contribution to existing adverse conditions or uses in the affected area." *Hanly II*, 471 F.2d at 830–831.[3]

Before applying the suggested tests to the Chicago Annex, it is well to compare it with the Foley Square detention center in some detail.

The Foley Square jail was built in the Civic Center area of lower Manhattan in an area with many government buildings and courthouses but also immediately south of New York's Chinatown where 50,000 people live, including 3,000 persons living in two large apartment buildings directly facing the jail some 100–150 feet away. It replaced an older Federal Detention Center located at West Street in Manhattan. It was designed as the detention center for 449 persons awaiting trial or convicted of

---

3. While speaking in terms of normative conditions, we understand from the inclusion of factor (2) that the standard for invoking the scrutiny of the full-scale procedure goes beyond protection and preservation of the environmental status-quo.

This two-part test is designed to avoid semantical battles over the meaning of "significantly" by substituting more precise factors to be taken into consideration in making the threshold determination. *Hanly II*, 471 F.2d at 831.

short-term federal offenses; it provides space for diagnostic services, and medical, recreational and administrative facilities; as many as 48 detainees may participate in a community treatment program whereby they will be permitted to spend part of each day in the city engaged in work or study activity, returning to the center after completion of each day's business; another program will provide service for out-patient non-residents; and the center is serviced by about 130 employees, only 90 of whom are on the premises at any one time. *Hanly I*, 460 F.2d at 642; *Hanly II*, 471 F.2d at 826.

The Chicago Annex detention center is being built on a square block bounded by Van Buren, Clark, Congress Parkway and Federal Streets, on the south fringe of the downtown Chicago business district or "Loop" in a blighted area of deteriorating buildings including "flophouses," adult book stores, arcades, liquor stores and taverns, interspersed with several new non-residential office and business buildings such as the Illinois Bell Telephone Building, the Western Union Building, the Federal Reserve Bank and many others. The Annex is in close proximity to the five major downtown Chicago federal buildings.[4] It is five blocks from the Chicago Civic Center and state courthouses and six blocks from the City Hall and County Buildings.

The district court found that "[t]here is no suggestion in this case that the detention facility will be built in close proximity to existing residential area . . . [n]or is there any evidence in the record which compels the conclusion that the site will ever be in close proximity to residential areas."

The Chicago Annex, unlike Foley Square, does not replace another federal detention center at another location within the city, but will house detainees presently maintained at the Cook County Jail on the southwest side of Chicago, City of Chicago House of Correction and Central Headquarters of the Chicago Police Department at 11th and State Streets, five blocks from the Annex, and at several county jails in adjoining counties.

The Annex is designed for approximately 393 detainees awaiting trial and serving short-term sentences; it provides space for diagnostic services and medical, recreational, educational, dining, counseling and administrative facilities; it will include a community treatment center to administer a pre-release program, but each participant in the program will be screened and those with a history of assaults or affiliated with organized crime or otherwise classified as serious offenders will be excluded; and the detention center will employ 153 persons whereas the parking facility will employ 24 persons.

Foley Square cost over $20 million, harmonized architecturally with existing area buildings, enhanced the appearance of the neighborhood, did not have fortress walls or steel-barred windows but instead had polycarbonate plastic shatter-proof windows of a dark gray color designed to insulate the community from visual contact with the detainees. *Hanly I*, 460 F.2d at 644; *Hanly II*, 471 F.2d at 832.

The Chicago Annex will cost over $20 million; the design earned an honor award for excellence from the Smithsonian Institute upon the recommendation of the National Public Advisory Panel on Architectural Services; a large portion of the site will be a 26,300 square foot open plaza landscaped with trees and provided with benches for the public and well-lighted for both daylight and evening use by the public;[5] the

---

4. The Annex is one block from the Everett McKinley Dirksen Building, one block from the Federal Building—U.S. Post Office, across the street from the 536 South Clark Street Federal Building, five blocks from the Main Post Office and six blocks from the U. S. Customhouse.

5. In the downtown Chicago business area, there are only three buildings with open plazas: the Civic Center Building, The First National Bank Building and the Federal Building—U.S. Post Office.

Clark and Congress Street sides of the site will also be lined with trees and planters; the entire ground level of the detention building will be a public lobby with large expanses of glass, lounge seating and a receptionist area. The neighborhood will be greatly enhanced; there will be no fortress walls or steel-barred windows; 5-inch wide windows, rigidly glazed with bronze-tinted tempered glass prevents persons in the plaza or otherwise outside from either being aware of activities in the facility or from communicating vocally or visually with persons inside the building.

The district court found:

"Every building, government or private, has an affect on the environment. This is particularly true of large buildings for commercial or institutional purposes. Yet the erection, completion, and occupancy of such buildings in the central city is traditionally considered a contribution to the quality of life worthy of commendation and expressions of appreciation from public officials representing the community. . . .

\*    \*    \*    \*    \*    \*

" . . . In making its determination of negative environmental impact, the General Services Administration had before it and considered information on the construction of the building, its conformity to the building codes, the adequacy of existing utilities proposed to be used, the availability and adequate supply of water, waste disposal facilities, gas, electricity and telephone service. Studies were made of the impact of the building on traffic, both on the side street which serves its entrance and which will be substantially widened and the major thoroughfares to which it is adjacent.

"From the record, it is clear that considered as a structure, the proposed U.S. Courthouse Annex and Federal Parking Facility has no more environmental impact on the quality of life in the Chicago urban communi-

ty than any other of the well constructed, well designed buildings which are being erected in the city on a variety of sites. The extensive evidence in the record satisfies the Court that there has been no abuse of discretion in the GSA determination of no significant environmental impact by virtue of the design, construction, or location of this structure."

The district court then closely analyzed the evidence and summarized it as follows: the essential contentions of the plaintiffs were that a "jail" and an 850-car parking facility have a significant environmental impact; plaintiffs' witnesses were reluctant to state flatly that in their opinions the proposed facility would have a deleterious environmental impact; the impact upon the quality of life of a structure designated as a jail is none the less real because psychological; and a concern for public safety was expressed by some but not all of plaintiffs' witnesses.

In *Hanly II*, the Court of Appeals considered the 25-page assessment by GSA and the evidence offered by the plaintiffs in that case and concluded that "[j]udged by the comparative uses in the area and according to its quantitative environmental effects, [the Foley Square detention center] should not have a significant effect upon the human environment". 471 F.2d at 833. However, the Court remanded the case to require GSA to make a further investigation of two issues not considered by GSA or the district court: whether a drug maintenance program would be carried on at the Center with the attendant dangers of the presence of drug addicts, drug pushers and hangers-on and whether the risk of crime might be increased as a result of the operation of the center. *Hanly II*, 471 F.2d at 834, 836. As Judge McGarr noted in the present case, after the *Hanly II* remand "it must be assumed that the areas of concern to the Court were satisfactorily resolved at the District Court level . . . [because] the detention facili-

ty in issue was completed and is in use . . . ."

In regard to the Chicago Annex, the GSA supplemental assessment expressly stated:

"The U.S. Courthouse Annex will *not* operate a drug maintenance unit. The Bureau of Prisons does not have a drug maintenance program at any Bureau operated community-based facility nor are any planned for the future."

In regard to the *Hanly II* issue of increased risk of crime, expressed in the Chicago Annex case as a concern for public safety, the district court found as follows:

"It is hardly necessary to observe that the criminals housed in the detention center are securely inside. Evidence of the security precautions connected with the use of part of the building as a prison, indicates more than adequate regard for public safety. Plaintiffs emphasize, however, that an area of greater concern lies in the visitation of this facility by probationers and parolees and other persons subject to accusation of crime and involved in the presentence investigation or counseling processes. The evidence amply demonstrates, and the General Services Administration did not err in concluding, that this situation is not a significant environmental concern. Indeed plaintiffs' witnesses, who were unstinting in their praise of the Everett McKinley Dirksen Building, were totally unaware that the same processes which they fear in the new building have been going on in the Dirksen Building since it has been open, and for many years in the old Courthouse which once stood across the street."

In regard to traffic, GSA showed that there will average 4 ingresses and egresses per business day for service deliveries and two daily ingresses and egresses for detainee transportation, mostly at non-peak traffic hours; that of the 850 vehicles to be parked, 350 are federal vehicles already occupying downtown parking space and the additional vehicles will have little effect upon the 238,000 vehicles presently entering the downtown area; that the facility adjoins the Congress Parkway which feeds directly into all main arterial highways and the interstate highway system without requiring traveling through the loop area. The district court concluded:

"The evidence considered by the General Services Administration . . . has as its principal thrust the fact that the additional parking made available in this building will not significantly increase the volume of traffic in and out of the Loop areas nor contribute significantly to congestion in the streets immediately surrounding the building. The General Services Administration reached this conclusion based upon this evidence. Having considered the same evidence, and additionally the testimony of plaintiffs' traffic expert, Professor John Bailey, this Court cannot conclude that this administrative determination was an abuse of discretion or was in any way unreasonable or arbitrary."

The district court found that GSA gave sufficient consideration to alternative sites; that under the circumstances of this case public hearings were not required but that GSA early disclosed its plans to the public and gave all interested parties ample opportunity to present their views and objections; that Sections 102(2)(A) and (D) were complied with and (B) and (C) were inapplicable (42 U.S.C. § 4332(2)(A), (B), (C) and (D)); and that the future plans for the City of Chicago were not significantly adversely affected:

"Whether there is a significant and adverse environmental impact resulting from the construction of the U.S. Courthouse Annex and Federal Parking Facility must be considered in the context of the place of the project in the overall plan for urban renewal and development of the area immediately south of Chicago's Loop, which was

the subject of almost constant reference by plaintiffs and all of plaintiffs' witnesses. The evidence reveals that development of this section of the city has been suggested to city planners by the recent availability for other purposes of some six hundred acres of land in the area immediately south of the Loop once utilized as a railroad yard. With the development of this land as the nucleus, broader plans have been formulated for the renovation of the entire area south of the Loop, commencing at a point somewhat south of the site of the building involved in the instant controversy and extending southward to approximately Roosevelt Road. The oft-referred-to plan is commendable but somewhat amorphous. It has not yet been published, nor was any copy of it available at the trial. According to the testimony of plaintiffs' witnesses, it involves the development of a 'New Town-In Town' concept embracing residential, commercial and industrial buildings made more desirable by their close proximity to the downtown area. The planners and the plans seem not to have been deterred by the fact that it will be contiguous with the Chicago Police Department Central Headquarters which also embraces a detention facility and supports the usual traffic of persons charged with crime going to and from the courts and administrative offices housed in that building.

"In contrast to the amorphous plan with which plaintiffs contend the proposed structure is not in harmony, are the present existing conditions surrounding the site.

\* \* \* \* \* \*

"It is also apparent from the evidence that New Town-In Town will not, in its contemplated residential development, come closer than several blocks from the Courthouse Annex, even if the residential development

were put at the northern-most extremity of the new project."

Finally, the district court reached the ultimate conclusion that the GSA determination "was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law or without observance of procedure required by law."

### III

The Congressional declaration of national environmental policy expressed in NEPA is as broad as the mind can conceive. After speaking of the "overall welfare and development of man," Congress declared that

"[I]t is the continuing policy of the Federal Government . . . to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans."

42 U.S.C.A. § 4331(a) (Cum.Supp.1973).

Of necessity, NEPA must be construed to include protection of the quality of life for city residents (*Hanly I,* 460 F.2d at 647) particularly in view of "the profound influences of population growth, high-density urbanization, [and] industrial expansion . . ." (42 U.S.C.A. § 4331(a)). Unfortunately, the environmental problems of the city are not as readily identifiable as clean air and clean water. The Council on Environmental Quality has noted:[6]

"Life in the inner city embraces a range of environmental problems, some starkly evident, some disguised, some acknowledged as environmental, some wearing other labels. . . .

\* \* \* \* \* \*

". . . [In the inner city] many of our most severe environmental

6. 2 Council on Environmental Quality Ann.Rep. 189–91 (August, 1971).

**1378**

problems interact with social and economic conditions which the Nation is also seeking to improve.

\* \* \* \* \* \*

"The traditional environmental objectives of clean air and water and preservation of national parks and wilderness are not the central concerns of most inner city poor. They focus instead on more immediate economic and social interest. . . .

". . . [T]here is growing evidence that among the urban poor—those with the most to gain from environmental improvement—are some who have decided to embrace environmentalism in their own distinct way. Their use of the term environment is broader than the traditional definition. Their concept embraces not only more parks, but better housing; not only cleaner air and water, but rat extermination.

\* \* \* \* \* \*

"The variety of environmental problems of the inner city and the absence of simple answers to these problems make it particularly important that efforts to overcome them be tailored to the needs and priorities of each locality."

These considerations mandate a balancing and weighing of multiple factors (*Compare* Scherr v. Volpe, 466 F.2d 1027, 1031 (7th Cir. 1972) with Arlington Coalition on Transportation v. Volpe, 458 F.2d 1323, 1329–1330 (4th Cir. 1972)) in order to determine the cumulative and absolute effects of the project.

The United States Bureau of Prisons advised GSA that the Chicago Annex must be as close to the federal courthouse [7] as possible in order to facilitate the transportation of detainees to and from the courts, to facilitate contacts between court staff and Annex staff on diagnostic services, to provide close proximity for observation and study of cases, to allow for ready availability of detention staff to judges, to provide ready accessibility for legal counsel, law enforcement agencies and volunteers, to provide ready availability of public transportation for visitors, and to centralize the location of Bureau of Prisons regional activities in the urban area. All of these aims have a recognized beneficial effect on the quality of the human environment.

Unlike Foley Square, the Chicago Annex does not replace an existing detention center but rather creates a separate centralized detention center for persons awaiting trial who otherwise would be scattered throughout Cook and adjoining counties in ordinary city and county jails as part of the general prison population. In concept, the Chicago Annex facility reflects the real and significant difference between the function of pre- and post-trial detention. It represents a progressive solution to a perplexing problem.

The problem of the pre-trial treatment of persons charged with crime but not convicted and thus presumed innocent has plagued society at least since the time of Blackstone, who observed: [8]

"[This] imprisonment, as has been said, is only for safe custody, and not for punishment; therefore, in this dubious interval between commitment and trial, a prisoner ought to be used with utmost humanity; and neither loaded with needless fetters, nor subjected to other hardships than such are requisite for the purpose of confinement only."

The Introduction to the Standards Relating to Pretrial Release of the American Bar Association Project on Standards for Criminal Justice notes that "[d]efendants presumed innocent are subjected to the psychological and physical deprivation of jail life, usually under more onerous conditions than are imposed on convicted defendants." [9]

7. The selected site is one block away.

8. 4 Blackstone, Commentaries 300 (1765).

9. Approved Draft at 2–3 (1968). *See* Research and Policy Committee of the Committee for Economic Development, Reducing

The Report of the President's Commission on Law Enforcement and Administration of Justice, The Challenge of Crime in a Free Society 179 (1967) recommended "[w]herever possible, persons awaiting trial should be housed and handled separately from offenders." [10] This recommendation was based on a task force conclusion that "[i]t is probably true that persons who have not yet been convicted of a crime are subjected to the worst aspects of the American correctional system." [11] *See, e. g.,* Anderson v. Nosser, 456 F.2d 835, 841 (5th Cir.1972).

The Chicago Annex is a facility needed by that portion of Society it is designed to serve. Although in a sense it is a jail, it will not have walls nor bars nor striped-clothed inmates,[12] but instead will be operated in an attractive building with its detention aspects wholly masked from public view and carried on in the same unobtrusive manner as detention activities are presently per-

Crime and Assuring Justice, A Statement on National Policy 40–41 (June, 1972):

"PRETRIAL DETENTION of those unable to obtain bail, and not released on their own recognizance or to specific custody, is largely the responsibility of 4,000 local jails. These also house persons convicted of minor offenses, with short sentences. Prisoners are held for months or years awaiting trial; convictions often lead to prison sentences shorter than the time already spent in jail. Meanwhile, the innocent and first offenders are thrown together with habitual criminals and frequently subjected to sexual assault. . . .

"Many of these jails are old, below acceptable physical standards. Worse, they lack recreational, educational, or medical facilities. Many are too small to be efficient; others, although large, are extremely overcrowded. Jailers and guards are rarely qualified. The corrective or curative element in these jails is nonexistent, but their ability to foster antisocial attitudes and to function as schools for crime is well documented.

"Constitutionally, persons charged with crime are presumed innocent until tried and found guilty, and should be treated accordingly."

10. The Report added at 178:

"No part of corrections is weaker than the local facilities that handle persons awaiting trial and serving short sentences. Because their inmates do not seem to present a clear danger to society, the response to their needs has usually been one of indifference. Because their crimes are considered petty and the sentences they serve are relatively short, the corrections system gives them low status. Many local jails and misdemeanant institutions are administered by the police or county sheriffs, authorities whose experience and main concern are in other fields. Most facilities lack well-developed recreational and counseling programs, sometimes even

medical services. The first offender, the innocent awaiting trial, somtimes juveniles and women are imprisoned with confirmed criminals, drunks, and the mentally disturbed or retarded."

11. President's Commission on Law Enforcement and Administration of Justice, Task Force Report: Corrections 24 (1967):

"For those who must be detained, the Commission recommends where possible the maintenance of entirely separate facilities. In a large city this might be economically feasible; in smaller jurisdictions full separation will be much more difficult. Even here, however, efforts should be made to avoid confining youthful or first offenders with others."

"It is probably true that persons who have not yet been convicted of a crime are subjected to the worst aspects of the American correctional system. Unconvicted persons, as yet legally innocent are almost inevitably subjected to the tightest security and receive the least attention of any group in jails.

\*      \*      \*      \*      \*

". . . Detention facilities for unconvicted persons are usually the worst of all institutions and are operated under maximum-security conditions.

"This primary concern for security imposes regimentation, repeated searches, and close surveillance on detainees. Most jails also have poor facilities for visiting, thus hampering a detainee's efforts to arrange for his defense and maintain contacts with the community. A detainee's lawyer, family, and friends have little opportunity for privacy."

12. This is not a case of erecting a fenced prison with guard towers in a "historical and architecturally significant rural community" laced with historical landmarks. Ely v. Velde, 451 F.2d 1130, 1133–1134 (4th Cir. 1971).

formed in the Everett McKinley Dirksen Building.[13]

Since the Bureau of Prisons, GSA and Congress have determined the need and the plaintiffs have not questioned the need, the only real question is where such a facility should be placed. It could not serve its function in a rural community;[14] it could serve its functions to a lesser degree but obviously not blend environmentally in the residential urban areas outside of the downtown area;[15] the facility could only be placed in the downtown section where the relatively few residents are in hotels and clubs, where the building blends into the courthouse—government—office building complex[16] and serves its functions to the maximum degree, and where it upgrades and enhances what had become a blighted area.

The major environmental obstacle in Foley Square was the presence of some 50,000 residents in close proximity to the proposed center, including 3,000 in the apartment buildings 100–150 feet away. The court there was concerned with "the peculiar environmental impact of squeezing a jail into a narrow area directly across the street from two large apartment houses," with families fearing "riots and disturbances" (*Hanly I*, 460 F.2d at 646),[17] and with "the sensibilities of a neighborhood" (*Hanly II*, 471 F.2d at 835). Here the district court found no present, nor forseeable future possibility of, close proximity to residential areas. The court further found that "when, if ever, this New Town—In Town project will commence," its contemplated residential development will not come closer than several blocks from the Annex.[18]

## IV

Upon analysis of the Chicago Annex in the context of the *Hanly* cases, certain conclusions inexorably emerge.

As the agency responsible for the acquisition of the site, the design and construction of the buildings, and their ultimate operation, GSA was the appropriate body to make the original determination as to environmental impact. *Hanly I*, 460 F.2d at 645.

13. In considering the unobtrusive design of this facility, we do not make further use of this aspect than to note that the center will be in visual harmony with the immediate vicinity. In the *Hanly* litigation and in this case, the "sensibilities" of the neighborhood have been a factor which the plaintiffs have asserted relates to the environmental impact of the project. As the court in *Hanly II* observed, "[i]t is doubtful whether psychological and sociological effects upon neighbors constitute the type of factors that may be considered in making such a determination since they do not lend themselves to measurement." 471 F.2d at 833. As regards public "sensibilities" aroused by criminal defendants, we question whether such factors, even if amenable to quantification, are properly cognizable in the absence of clear and convincing evidence that the safety of the neighborhood is in fact jeopardized.

14. And would not be any more welcome there. See n. 12 *supra*.

15. GSA gave consideration to locating the proposed detention center in the Fifth U.S. Army Headquarters Building, about six miles south of the Chicago loop, but this location was in the Hyde Park-Kenwood Urban Renewal Project area and its director advised that the City desired this area to be used for residential purposes only, specifically high-rise apartments.

16. "For instance, one more highway in an area honeycombed with roads usually has less of an adverse impact than if it were constructed through a roadless public park." *Hanly II*, 471 F.2d at 831.

17. This fear was considered minimized in *Hanly II* by GSA's expanded assessment establishing the unobstrusiveness blending and security of Foley Square. The court also found that during the past five years there had been only two small inside disturbances at the then existing detention center and three outside disturbances consisting of non-violent picketing. *Hanly II*, 471 F.2d at 833. There have been no inside or outside disturbances involving federal prisoners at the Cook County Jail in Chicago where the majority of federal detainees are presently housed.

18. The district court found "no strong element in this case of the 'sensibilities of a neighborhood' which was an acute problem in *Hanly* . . ." See n. 13 *supra*.

There appears to be no dispute that this $20 million project is a "major Federal action" even as the Foley Square $20 million project was conceded to be a major action. *Hanly II*, 471 F.2d at 826–827.

■ In making the threshold determination of whether the Chicago Annex was one of those "major Federal actions significantly affecting the quality of the human environment" requiring a detailed environmental impact statement (42 U.S.C.A. § 4332(2)(C)), GSA was required to "affirmatively develop a reviewable environmental record." *Hanly I*, 460 F.2d at 647; *Hanly II*, 471 F.2d at 827, 836. Upon remand in the present case, the GSA made that kind of a record.[19]

■ Both GSA and the district court, after weighing and balancing all of the pertinent environmental factors, have determined that the Chicago Annex does not "significantly affect the quality of the human environment." The GSA has some expertise in this area (*cf.* Butz v. Glover Livestock Commission Company, Inc., 411 U.S. 182, 93 S.Ct. 1455, 36 L. Ed.2d 142 (1973); Moog Industries,

Inc. v. F. T. C., 355 U.S. 411, 413, 78 S. Ct. 377, 2 L.Ed.2d 370 (1958)) and its determination must stand unless its findings are arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law or without observance of procedure required by law.

■ The district court, after two evidentiary hearings and a carefully considered opinion incorporating its findings and conclusions, determined that the GSA findings were not arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law or without observance of procedure required by law. Every issue raised on appeal was considered by the district court, its findings of fact are not "clearly erroneous" (Fed.R.Civ.P. 52(a)), and our view of the record mandates the conclusion that its findings and its conclusions of law are correct. Transcontinental Gas Pipe Line Corp. v. Hackensack Meadowlands Dev. Comm'n, 464 F.2d 1358, 1364 (3rd Cir. 1972).

The judgments of the district court denying the preliminary and permanent injunctions are affirmed.

Affirmed.

---

19. In *Hanly II*, the court repeatedly referred to the 25-page environmental assessment as satisfying GSA's responsibility for developing the record (subject to the two issues which were satisfied later). "The Assessment closely parallels in form a detailed impact statement." *Hanly II*, 471 F.2d at 832. We have read the Foley Square assessment and have compared it with the 142-page supplemental assessment in this case. While the two statements cannot be weighed by the number of pages, it is readily apparent by content comparison that here GSA not only considered every element earlier considered for Foley Square but many additional factors as well. The analysis also appears to be more penetrating and critical. It is obviously not a "rewrite" of the original 4-page draft. *Cf. Hanly II*, 471 F.2d at 833.