**BOROUGH OF MORRISVILLE et al.**

v.

**DELAWARE RIVER BASIN COMMISSION.**

No. 74–1226.

United States District Court,
E. D. Pennsylvania.

July 31, 1975.

See also, D.C., 382 F.Supp. 543.

Lawrence Sager, Pottstown, Pa., for plaintiffs.

William Miller, Delaware River Basin Commission, Princeton, N. J., for defendant.

## MEMORANDUM AND ORDER

NEWCOMER, District Judge.

The Delaware River Basin Commission is neither wholly a federal agency nor a state one. It is a body on which both the federal government and each of the four states through whose territory the Delaware River runs are equally represented. Created in 1961 by the Delaware River Basin Compact, the Commission was a response to the controversies over the Delaware's waters which had twice pitted the states adjoining the river against one other in the United States Supreme Court.[1] The members of the Commission are the governors of the four member states, New York, New Jersey, Pennsylvania, and Delaware, and one commissioner appointed by the President of the United States. The Dela-

---

1. *New Jersey v. New York*, 283 U.S. 336, 51 S.Ct. 478, 75 L.Ed. 1104 (1931); *New Jersey v. New York*, 347 U.S. 995, 74 S.Ct. 842, 98 L.Ed. 1127 (1954).

ware River Basin Compact is unique among the interstate agencies approved by Congress in that Congress affirmatively acted to make the federal government a partner rather than merely consenting to the Compact's formation under Article 1, § 10 of the Constitution.

The powers of the Commission, which are in issue here, extend generally throughout a 12,765 square mile area from the headwaters of the Delaware River in New York's Catskill mountains to the Delaware Bay. The Commission has the power to set the amount of water which each community may take from the River, subject only to the shares already enjoyed by some communities under the Supreme Court decrees predating the Compact, and has engaged in projects to improve the quantity and quality of the common water supply. Among these projects have been the construction of two reservoirs —the Blue Marsh Reservoir and the Beltzville Reservoir—to increase the Basin's stored water supply. The Commission did not actually construct these reservoirs but contracted[2] with the U. S. Army Corps of Engineers to repay the federal government for the costs of including water storage among the capabilities of the two reservoirs. To meet these contractual obligations the Commission adopted the water use charges which are in dispute here.

By a resolution dated May 22, 1974 (hereinafter "Resolution 74–6"), the Commission for the first time imposed charges for the use of the surface waters of the Delaware. The financial obligations incurred by the Commission had previously been met from the general revenues of the member states. Resolution 74–6, which established the relatively nominal rate of $.04 per thousand gallons for consumptive use and $.0004 per thousand gallons for non-consumptive use, represented the culmination of ten years of Commission staff studies and public hearings on the issue of how the costs of storing water in the reservoirs should best be met. The compromise embodied in Resolution 74–6 was that part of these costs should be financed from the signatory states' tax revenues and part from charges levied on the individual users of the river's waters. The theory behind the user charges was that the River Basin should be seen as one pool of water which each user benefiting from the enlargement of the pool's water supply regardless of whether the water stored in the reservoirs directly benefit the user. In explaining the "pooled water" concept, the Commission stated:

"All users benefit from a regulated pool of water. In this case, the pool is defined as the Delaware River Basin System. As water seeks its level over its entire surface, benefits tend to diffuse to users of water resources throughout the entire pool service area. So long as a reservoir, regardless of its location, contributes to the entire pool, at a justified cost, and so long as users are dependent upon the pool for their supply, benefits accrue to users at least to the extent of their alternative cost of providing the service they enjoy from the pool." Notice to Interested Parties, Water Supply Pricing Hearing Issues, Part II, pp. 4–7.

According to this concept, the upriver user pays towards a downriver reservoir in lieu of replacing the water which it takes from the River.

The charges imposed by Resolution 74–6 are based on the unit cost of stor-

2. The contract between the Commission and the U. S. Army Corps of Engineers covering the construction of storage facilities for non-federal uses at the Blue Marsh Dam and Reservoir was signed on May 14, 1971. A contract for repayment of the costs of water supply storage in the Beltzville Dam, dated October 26, 1966, was executed by the Commission and the Philadelphia District Engineer of the Corps of Engineers, but is technically not effective since it has not yet been approved by the Secretary of the Army. The Commission has not entered into any contract with the Corps of Engineers concerning the proposed Tocks Island Dam.

ing water at the federal water storage facilities. The unit cost of water is arrived at by dividing all of the Commission's annual water storage costs by the net yield of the water supply in the federal reservoirs operating under contract with the Commission. The charge is the weighted-average unit cost, so that the future rates will depend on the unit costs for storage facilities in the new projects and the base charge will be adjusted downwards or upwards depending on the unit cost of the added facility.

Plaintiffs herein are seven Pennsylvania municipalities who use the water from the Delaware River and who will have to pay charges for this water under Resolution 74–6. Plaintiffs claim that by imposing the water charges the Commission exceeded its authority under the Compact, violated several sections of the Compact, and violated the Water Supply Act of 1958. The basic premise underlying these challenges is that the Commission is required by the Compact and the 1958 Act to relate any costs charged to a user for a project to the benefits that user derives from it, and that plaintiffs, all of whom, except Monroe County, lie downstream from the Reservoirs, derive no benefit from the increased storage capacity. Plaintiffs also contend that by adopting the charges without first issuing an environmental impact statement the Commission violated the National Environmental Policy Act of 1969 (hereinafter "NEPA").

I. *Commission's Authority to Impose Charges.*

The Commission argues that the power to impose charges for water can be derived from any of the following sections of the Compact:

i. Section 3.3, empowering the Commission to allocate waters among the signatory states and their political subdivisions "in accordance with the doctrine of equitable apportionment." This section expressly authorizes the Commission to "impose conditions, *obligations* and release requirements related [to water allocation]", subject to the rights of the signatory parties under the Supreme Court's decree in *New York v. New Jersey*, 347 U.S. 995, [74 S.Ct. 842] (1954). (Emphasis added);

ii. Section 3.7, permitting the Commission to fix "rates, rentals, charges, and tolls and classifications thereof, for the use of facilities which it may own or operate and for products and services rendered thereby . . .";

iii. Section 4.1, conferring upon the Commission the power to "develop, implement and effectuate plans and projects for the use of the water of the basin. . . .";

iv. Section 3.6(h), which allows the Commission to "exercise such other and different powers . . . necessary or convenient to carry out its express powers or which may be reasonably implied therefrom."

Before discussing these manifold and apparently overlapping sections, it should be noted that the Compact expressly authorizes the Commission to "acquire, operate, and control projects and facilities for the storage and release of waters . . ." Compact, Section 4.2(a). The Commission is not expressly invested with the power to fix charges by the section dealing with water storage, but rather arguably derives this power from the Compact sections cited in the paragraphs above.

■ Plaintiffs' attack on the validity of Resolution 74–6 under the Compact centers on its exemption of certain users from the obligation to pay the rates, at least until that user consumes more than a minimum level set by the Commission.[3]

---

3. Although no party raised the issue of plaintiffs standing to sue for alleged violations of the Compact, we must address this issue since it involves the propriety of jurisdiction over the subject matter of this suit. Given the federal government's presence on the Commission and its role in the creation of the Compact, we believe that plaintiffs

This exemption is based on Section 15.1(b) of the Compact which states that:

"No provision of Section 3.7 [the Section permitting the Commission to impose rates for the use of its facilities] shall be deemed to authorize the Commission to impose any charge for water withdrawals or diversions which could lawfully have been made without charge on the effective date of the Compact . . ."

Resolution 74–6 has interpreted "lawfully" as used in Section 15.1(b) to mean the lesser of a user's permitted divertible water or pumping capacity at the time the Compact became effective. In order to qualify for an exemption, a user must establish that it had a permit authorizing the volume of water sought to be exempted as of the Compact's effective date, and that the user had physical facilities at that time with the capacity to use the volume claimed to be exempt from the charge. The lesser of the two measures, permit or physical capacity, determines the amount of a user's entitlement or exempted use.

Plaintiffs, however, interpret "lawfully" in Section 15.1(b) to mean "in accordance with the doctrine of equitable apportionment" as stated in Section 3.3. Plaintiffs argue that the entitlements of users under Section 15.1(b) are subject to the rights and obligations of the states, including the obligation to use the Delaware's waters according to the doctrine of equitable apportionment.

Before we can address the question of whether plaintiffs' or defendant's interpretation of Section 15.1(b) is correct, we must determine whether that section applies at all. The exemption provision of 15.1(b) is triggered by a charge imposed pursuant to Section 3.7; if the Commission is not empowered by Section 3.7 to charge the rates authorized in Resolution 74–6, then the exemptions which it is granting to some users are unnecessary. (Assuming, of course, that the rates are lawful under some other Section than Section 3.7).

Section 3.7 empowers the Commission to charge for the "use of facilities which it may own or operate and for products and services rendered thereby . . ." The legislative history appears to conflict as to authority to charge for the unit cost of the Reservoirs, i. e., the augmentation of the water supply. The Report of the House Judiciary Committee on the proposed Section 3.7 (which remained unchanged throughout the ratification of the Compact) states:

"Section 3.7 authorizes the commission to make charges for the use of facilities which it may own or operate and for products and services rendered by such facilities, exempt from any other public regulation or control. *It should be noted that no power is delegated to the commission to make any charge with respect to navigation or on account of any withdrawal of water from the river in its natural state.*" Report on H.J.Res. 225, 225 87th Congress, House Report Number 310, at pp. 15–16 (Emphasis Added).

On the other hand, in the House Judiciary hearings on the Compact, the Director of the predecessor agency to the Commission indicated that the Com-

---

standing to sue in this case is governed by the same standards as are plaintiffs who challenge action under any federal statute. *The Bootery, Inc. v. Washington Met. Area Transit Auth.*, 326 F.Supp. 794 (D.C.D.C. 1970). We believe that plaintiffs have demonstrated that they would suffer injury-in-fact from the proposed Commission action and that their interests are arguably within the zone of interests to be protected or regulated by the statute sued upon. *Ass'n of Data Processing Service Organizations, Inc.*

*v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L. Ed.2d 184 (1970). We agree with the district court in the *Washington Metropolitan Transit Authority* case, cited supra, 326 F. Supp. at 798, that

"To hold that the Compact is an agreement between the political signatories imputing only to those signatories standing to challenge actions pursuant to it would be unduly narrow in view of the direct impact on plaintiffs and other taxpayers."

mission might be able to charge enough for a water supply project (reservoir) to make such a project economically self-liquidating. Committee on Judiciary, Subcomm. No. 1, on H.J.Res. 225, Delaware River Basin Company, March 8, 1961, at p. 62. Such charges could reasonably be contemplated as arising under Section 3.7.

Section 15.b(1) was one of the amendments added to the Compact by Congress as a precondition of federal participation. These amendments were added, in the words of the Report of the Senate Committee on Public Works, "in order to provide minimum protection of federal interests . . ." Committee on Public Works, Report on S856, 87th Congress, Senate Report 985, at p. 6. It is unclear from the legislative history, and we are not able to fathom, what the federal interest is in insuring that pre-1961 users be exempt from Commission charges. However, if the pooled water concept is taken as valid, the charges imposed by Resolution 74–6 are clearly charges ". . . for the use of . . . services rendered by . . . facilities [owned or operated by the Commission]. Therefore we cannot conclude that Section 15.1(b) does not apply here, even if the charges are authorized by other sections of the Compact.[4]

■ As stated before, plaintiffs claim that a lawful taking under Section 15.-1(b) means a taking subject to the constraints of equitable apportionment. Plaintiffs' definition of equitable apportionment closely resembles the doctrine of reasonable use, the prevailing water rights doctrine among the Northeast states and among the Delaware River Basin states in general. Under this doctrine, a riparian owner is entitled to as much water as he reasonably needs, so long as this use does not materially affect the quality and quantity of the water in the stream or of its flow. *Hanks, The Law of Water in New Jersey*, 22 Rutgers L.Rev. 621, 627–28 (1968). According to plaintiffs, the exemptions violate this principle by allowing communities to divert water from the river without paying for it.

Actually, the doctrine of equitable apportionment is more complex and elusive than plaintiffs make it out to be. The law of equitable apportionment developed out of several lawsuits between states in the Supreme Court's original jurisdiction. "It is the term used to identify the federal interstate common law applicable to interstate disputes over water rights in the original jurisdiction of the Supreme Court." R. E. Clark, *Waters and Water Rights*, Vol. II, ¶ 132.1, pp. 324–25. This same treatise describes the doctrine as "the standard of ad hoc justice in the court's original jurisdiction and [] likely to be more flexible, if more unpredictable, than the law in another court." Id., ¶ 132.7, at p. 352. As Justice Holmes stated in speaking of the doctrine:

"the different traditions and practices in different parts of the country may lead to varying results but the effort always is to secure an equitable apportionment without quibbling over formulas." *New Jersey v. New York*, 283 U.S. at 343, 51 S.Ct. at 479 (1931).

The Supreme Court cases dealing with water controversies between states applying the prior appropriation doctrine—principally those states west of the Mississippi—have applied the water rights doctrines of the affected states with certain modifications.[5] However,

---

4. Plaintiff has not raised any equal protection challenge to Section 15.1(b) as it has been applied here, and we take no position on its constitutionality.

5. These modifications were detailed in Justice Douglas' opinion for the Court in *Nebraska v. Wyoming*, 325 U.S. 589, 65 S.Ct.

1332, 89 L.Ed. 1815 (1945). In addition to prior apportionment and protection of an existing economy, Justice Douglas stated that the following were relevant factors in determining an equitable apportionment:

". . . physical and climatic conditions, the consumptive use of water in the several sections of the river, the character

it would be presumptuous to say that the doctrine of equitable apportionment would mirror the riparian owner-reasonable use doctrine in suits between states applying the latter doctrine. Indeed, the Court refused to do so for unarticulated reasons in the case of *Connecticut v. Massachusetts*, 282 U.S. 660, 51 S.Ct. 286, 75 L.Ed. 602 (1931), and affirmed the Master's Reports in the two cases involving the Delaware River without commenting on the applicability of any legal doctrines. As is pointed out in Clark's Treatise, cited above "[t]he Court must exercise a law-making and policy function in order to arrive at a judgment appropriate to the particular case", especially when the riparian doctrine, which is "ill-adopted to the exigencies which require vast projects", is involved, R. E. Clark, *Waters and Water Rights,* Vol. II, ¶ 132.6, at p. 349.

■ Given the ad hoc and balancing features of the equitable apportionment doctrine, this Court cannot rule that it has been violated by the Commission's water use charges, particularly where their effect, if any, on the future allocation of water and flow regime is unknown.

■ Plaintiffs also argue that the exemptions violate Article 11.4 of the Compact. Article 11.4 reads:

"*Project Costs and Evaluation Standards.* The commission shall establish uniform standards and procedures, for the evaluation, determination of benefits, and cost allocations of projects affecting the basin, and for the determination of project priorities, pursuant to the requirements of the comprehensive plan and its water resources program. The commission shall develop equitable cost sharing

and rate of return flows, the extent of established uses, the availability of storage water, the practical effect of wasteful uses on downstream areas, the damage to upstream areas as compared to the benefits to downstream areas if a limitation is imposed on the former . . . ."

and reimbursement formulas for the signatory parties . . .."

Plaintiffs' argument seems to be that the pooled waters policy underlying the charges, when modified by the exemptions, does not establish "equitable cost sharing." There is no authority on what this term means, but it seems clear from a reading of other sections in the Compact that the Commission may grant exemptions pursuant to 15.1(b) without rendering its cost allocations inequitable. The exemption clause was added by Congress, and was an absolute precondition to federal consent to, and participation in, the Compact. Thus, all the Compact's other requirements must be read in light of Section 15.1(b). To say that no charges are equitably allocated if exemptions are granted would be to say that the Commission could never impose charges, even though it is expressly given that power by Article 3.7 of the Compact.

■ Plaintiffs' final argument, that by levying use charges the Commission is "engag[ing] in the business of distributing water" in violation of Section 4.5 of the Compact appears to be makeweight in that plaintiffs themselves acknowledge that such rates would be legitimate if based upon a direct cost/benefit ratio.

■ We find from an examination of the materials presented to us by both sides that the Commission is empowered by the Compact to impose use charges for the River's surface waters, that the granting of entitlement exemptions under Section 15.1(b) of the Compact is not arbitrary, capricious, or otherwise not in accordance with law, and that the charges as modified by the exemptions do not violate any other sections of the Compact.

The Court added:
"[these factors] are merely an illustrative not an exhaustive catalogue. They indicate the nature of the problem of apportionment and the delicate adjustment of interests which must be made." 325 U.S. at 618, 65 S.Ct. at 1350.

II. *Validity of the Charges under the Water Supply Act of 1958.*

Plaintiffs claim that the Federal Water Supply Act of 1958 requires the Commission to levy the costs of water storage projects against the states rather than against individual water consumers, and that these costs be borne by the parties whom the projects directly benefit. Since Resolution 74–6 does neither of these, plaintiffs argue, it runs afoul of the Act.

 The 1958 Act establishes the policy that "nonfederal" interests should have primary responsibility for developing water supplies. However, the Act permits the Corps of Engineers to cooperate with non-federal interests by incorporating water storage facilities into federally constructed multiple-purpose reservoir projects as long as the non-federal interests agree to repay the federal government for the costs attributable to water storage. The U. S. Army Corps of Engineers was acting pursuant to this Act when it contracted with the Commission for the inclusion of water storage facilities in the Blue Marsh and Beltzville Reservoirs. The Act, allowing such inclusions, provides:

"storage may be included in any reservoir project surveyed, planned, constructed or to be planned, surveyed and/or constructed by the Corps of Engineers or the Bureau of Reclamation to impound water for present or anticipated future demand or need for municipal or industrial water, and the reasonable value thereof may be taken into account in estimating the economic value of the entire project: *Provided, That the cost of any construction or modification authorized under the provisions of this section shall be determined on the basis that all authorized purposes served by the project shall share equitably in the benefits of multiple purpose construction,* as determined by the Secretary of the Army or the Secretary of the Interior, as the case may be: Provided further, That before construction or modification of any project including water supply provisions for present demand is initiated, State or local interests shall agree to pay for the cost of such provisions in accordance with the provisions of this section: And provided further, That not to exceed 30 per centum of the total estimated cost of any project may be allocated to anticipated future demands where State or local interests give reasonable assurances, and there is reasonable evidence, that such demands for the use of such storage will be made within a period of time which will permit paying out the costs allocated to water supply within the life of the project: And provided further, That the entire amount of the construction costs, including interest during construction, allocated to water supply shall be repaid within the life of the project but in no event to exceed fifty years after the project is first used for the storage of water for water supply purposes, except that (1) no payment need be made with respect to storage for future water supply until such supply is first used, and (2) no interest shall be charged on such cost until such supply is first used, but in no case shall the interest-free period exceed ten years . . ." (Emphasis added)

 This language appears to be directed solely toward the Secretary of the Army and the Secretary of the Interior, and it is questionable whether it creates any liabilities on the part of the defendant herein. However, assuming that it does, a reading of this section reveals that it does not impose the liabilities suggested by plaintiffs. The portion quoted above provides that "State *or* local interests shall agree to pay for the cost of such provisions . . ." [emphasis added], which clearly negates plaintiffs' argument that these costs can only be lawfully taxed against states. Plaintiffs' "equitable sharing of the benefits" argument, which presumably is based on the language of the section emphasized above, completely misinter-

prets the Act. This language addresses the apportionment of costs between the federal and non-federal purposes of a reservoir; it in no way deals with how the non-federal costs should be met. The simple answer to plaintiffs' argument is that in authorizing the Corps of Engineers to build storage facilities for non-federal use Congress did not also impose upon the Corps the responsibility of determining how the non-federal interests should raise the revenues to pay for their costs, nor the responsibility to see that the non-federal interests equitably apportion those costs among themselves.

Since neither party submitted any evidence on this claim other than a Corps of Engineers interpretive manual, the Court will enter judgment for defendant on the pleadings rather than summary judgment.

### III. *The Commission's Decision Not to Prepare a Full Environmental Impact Statement.*

On May 17, 1974, five days before the adoption of Resolution 74–6, the Commission's Executive Director announced his conclusion that the National Environmental Policy Act. (NEPA), 42 U.S.C. §§ 4332 *et seq.*, did not require the preparation of an environmental impact statement concerning the Resolution's water charges. 39 Fed.Reg. 18320. This conclusion, called a "negative declaration", was made after a preliminary assessment of the charges' environmental impact and after a public hearing.[6]

A negative declaration is proper under NEPA only when proposed federal[7] action is either not "major" or does not "significantly affect [] the quality of the human environment." 42

U.S.C. § 4332(C). It is undisputed that the charges are major actions; the more difficult question, which the Commission decided in the negative, is whether they would significantly affect the quality of the human environment.

Procedurally speaking, the Director properly arrived at his negative declaration. Part II of the Commission's Administrative Manual entitled "Rules of Practice and Procedure" sets forth procedures to be followed in determining whether a proposed project requires an impact statement. *Manual,* Article 4. The Manual provides for the issuance of a negative declaration in the case of a project which, as a result of an environmental assessment, has been determined not to have potential significant environmental consequences. Article 4, Section 2–4.5(a). Prior to the issuance of a negative declaration, the Executive Director must publish notice of his intent to do so. Article 4, Section 2–4.5 (b). Article 4, Section 2–4.4 states that an environmental assessment shall "identify and evaluate the expected and potential impacts of the action and the alternatives considered." The Section continues: "The assessment will determine whether significant impact upon the environment can be anticipated from the proposed action." The Commission completed an environmental assessment purporting to comply with Section 2–4.4 in March, 1974.

However, the fact that the Commission complied with its own impact statement procedures does not mean that the environmental assessment underlying the negative declaration meets NEPA's standards. The assessment examines in prolific detail the impact of the pro-

---

6. The Commission originally thought that a full environmental analysis should be prepared for the proposed water use charges, and so notified the general public. See Exhibits J & L to Defendant's Motion for Summary Judgment. However, the preparation of a draft impact statement having been undertaken, the staff concluded that the charges would not lead to any significant environmental consequences. (Exhibit P, De-

fendant's Memorandum). The aborted draft impact statement then became the environmental assessment. (For a discussion of environmental assessments, see pp. 477–478, infra).

7. The Commission concedes that it is a federal agency for purposes of the National Environmental Policy Act.

posed rates on the demand for water in the Basin region, and the consequent impact on the prices and demand for goods and services which use water. The assessment's conclusion that water charges at the proposed levels would not have a significant adverse impact on the human environment is based on data showing that the demand for water throughout the Basin is fundamentally inelastic. The scope of the assessment is, however, restricted to the impact of the charges on primary and secondary water use; it does not examine the environmental consequences of the "pooled water" concept underlying the charges. Nor does it examine the environmental consequences of the alternatives of charging only those users who directly benefit from the Reservoirs' increased storage capacity or the alternative of raising the necessary revenues from the signatory states alone.

Plaintiffs argue that the assessment —and therefore the negative declaration —is inadequate because of its failure to deal with the environmental effects of deal with the environmental effects of the pooled water concept or the alternatives specified in the proceeding paragraph. Plaintiffs also claim that the charges are "the first step in a system-wide water management regulation activity," including the construction of the Tocks Island Dam and Reservoir, aimed at augmenting the water supply. Defendant argues in response that whether the Tocks Island project should be built is a decision separate from the decision to implement the water charges, that the latter decision will not affect the former, and that no other water management questions are raised by the charges. Defendant also contends that examination of the environmental consequences of alternate means of raising revenue to pay the non-federal costs of the Reservoirs would be speculative and therefore not properly part of any environmental assessment.

Neither the Supreme Court nor this Circuit has passed upon the standard that a District Court should apply in reviewing an agency's decision that no environmental impact statement is required, and those Circuits which have ruled on the matter have split along three lines. Some Circuits have stated that the agency's negative determination would be upheld if it was not "arbitrary or capricious." *First National Bank of Chicago v. Richardson,* 484 F.2d 1369 (7th Cir. 1973); *Rucker v. Willis,* 484 F.2d 158 (4th Cir. 1973); *Hanly v. Kleindienst,* 471 F.2d 823, (2nd Cir. 1972). Other Circuits have adopted a more stringent "reasonableness" test under which an agency's negative determination will be sustained where there is supporting evidence in the record and a reasonable basis in law. *Minnesota Public Interest Research Group v. Butz,* 498 F.2d 1314 (8th Cir. 1974); *Wyoming Outdoor Coordinating Council v. Butz,'* 484 F.2d 1244 (10th Cir. 1973); *Save Our Ten Acres v. Kreger,* 472 F.2d 463 (5th Cir. 1973). The District of Columbia Circuit has endorsed neither the "reasonableness" test nor the "arbitrary and capricious" test. Instead it has adopted a test suggested by Judge Friendly in his dissenting opinion in *Hanly,* cited *supra.* Under this test, an agency's assessment must provide convincing reasons that "arguably" potentially significant impacts do not require a detailed environmental impact statement. *Maryland-National Capital Park and Planning Commission v. Postal Service,* 159 U.S.App.D.C. 158, 487 F.2d 1029 (1973).

While this Court believes, for the reasons set forth *Wyoming Outdoor Coordinating Council v. Butz, cited supra,* that a higher standard of review than the "arbitrary and capricious test" is required in NEPA cases, the Commission's treatment of the environmental impact of the charges themselves clearly passes muster under any of the three standards outlined above. It is true, as plaintiffs assert, that a federal agency may, under certain circumstances, be required to prepare an environmental impact statement on the policy underlying

a proposed rate scheme, *SCRAP v. U. S.*, 346 F.Supp. 189 (1972), *rev'd on other grounds*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). However, such a statement need only examine the impact of the policy insofar as it is implemented by those rates. *Id.*, at 201. As for plaintiffs' contention that defendant failed to consider the relative environmental impact of alternatives to the proposed action, such as, for example, ignoring the exemption clause (Section 15.1(b) and charging all users of surface water, or taxing the Reservoir's costs against the signatory states alone, we believe that this type of inquiry is not required unless it is first found that the proposed action will significantly affect the environment. The particular appropriateness of this view [8] in this case is apparent from plaintiffs counsel's oral argument, in which he indicated that if the citizens of Philadelphia were compelled to consider how much of the Reservoirs' costs they would have to bear without the 15.1(b) exemption, or solely on a direct benefit basis, they might well decide that building the Reservoirs was too costly. What plaintiffs want is not an environmental, but a political impact statement, which is neither required by NEPA nor within the Commission's expertise to prepare.

Plaintiffs have failed to show that, absent the Commission's proposed charges, the Tocks Island Dam and Reservoir or the water management policy of which it is a part would not go forward. The proposed Tocks Island Dam and Reservoir project is currently undergoing its own environmental analysis.[9] Obviously this reservoir and the other reservoirs must be financed in some fashion, and plaintiffs' argument seems to be that since no other method of financing is politically acceptable, the method the Commission chose "causes" these reservoirs to be built. But once the Commission's preliminary assessment reveals that the chosen method of financing will not significantly affect the quality of the human environment, and this assessment is upheld on review, NEPA does not require the Commission to pass on the environmental significance, let alone the political feasibility, of possible alternative financing methods.

ORDER

And now, to wit, this 31st day of July, 1975, defendant's motion for summary judgment on plaintiffs' claim that it failed to comply with the National Environmental Policy Act of 1969 is hereby granted, and plaintiffs' motion for summary judgment on this same issue is hereby denied.

Defendant's motion for summary judgment on plaintiffs' claim that Resolution 74–6 violated the Delaware River Basin Compact is hereby granted, and judgment is hereby entered in favor of defendant and against plaintiffs on this claim.

Defendant's motion for summary judgment on plaintiffs' claim that Resolution 74–6 violates the Federal Water Supply Act, having been treated by this Court as a motion for judgment on the pleadings, is hereby granted, and judgment is hereby entered on behalf of defendant and against plaintiffs on this claim.

Judgment is entered in favor of defendant and against plaintiffs on all claims raised by plaintiffs.

And it is so ordered.

---

8. 42 U.S.C. § 4332(A), (C)(iii) requires that the environmental impact statement consider "alternatives to the proposed action", but an impact statement itself is required only after it has been determined that the proposed action "significantly affect[s] the quality of the human environment." 42 U.S.C. § 4332(2)(C).

9. On August 8, 1974, Congress appropriated $1,500,000 for a new environmental study of the project. This study was recently completed, public hearings have been held, and the Commission is currently considering whether or not to approve the Tocks Island project.