DELAWARE WATER EMERGENCY
GROUP, et al.

v.

Gerald M. HANSLER, et al. and Neshaminy Water Resources Authority and Philadelphia Electric Company.

Civ. A. No. 80–4372.

United States District Court,
E. D. Pennsylvania.

Aug. 17, 1981.

Harold A. Lockwood, Jr., Lockwood, Reid & Bolger, Philadelphia, Pa., for plaintiffs.

David J. Goldberg, Trenton, N. J., for Delaware River Basin Commission.

Hershel J. Richman, Cohen, Shapiro, Polisher, Shiekman & Cohen, Philadelphia, Pa., for Neshaminy Water Resources Authority.

Bernard Chanin, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., for Philadelphia Elec. Co.

MEMORANDUM OPINION AND ORDER

VanARTSDALEN, District Judge.

This action challenges the validity of approvals granted by the Delaware River Basin Commission (DRBC or Commission) to the Philadelphia Electric Company (PECO) and the Neshaminy Water Resources Authority (NWRA) to construct facilities for the withdrawal, diversion and use of water from the Delaware River by means of a pumping station at Point Pleasant, Bucks County, Pennsylvania. A maximum of approximately forty-six million gallons of water per day (46 mgd) would be allowed to be pumped and transported by conduits into the Perkiomen Creek watershed to provide additional cooling water for the nuclear energy electric generating station presently under construction in Limerick, Montgomery County, Pennsylvania, along the Schuylkill River. In addition, a maximum of approximately 49 mgd would be allowed to be pumped and transported into the headwaters of the Neshaminy Creek. NWRA would be allowed to withdraw a

maximum of approximately 40 mgd from the Neshaminy Creek at a water treatment plant to be constructed by NWRA in Chalfont, Bucks County, Pennsylvania, for public water supplies in portions of Bucks and Montgomery Counties.[1] The total maximum withdrawals from the Delaware River at the Point Pleasant pumping station would be 95 mgd, which is a "down-scaled" version of previously approved plans for withdrawal of a maximum of 150 mgd.

Primarily because of the substantially reduced quantity of water permitted to be withdrawn from the Delaware River from that previously approved by DRBC for NWRA, the present applications were approved upon the basis of a "negative declaration" following the preparation of a final environmental assessment (FEA) that concluded that an environmental impact statement (EIS) need not be prepared because there would be no significant adverse impacts on the environment. The focal points of plaintiffs' challenge to the DRBC's approvals are the failure of DRBC to have a new, updated overall environmental impact statement prepared and the alleged failure to study and consider adequately various potential environmental effects · of the projects.

DRBC, PECO and NWRA have each filed motions[2] which, in substance, seek a final determination of this lawsuit in their favor on the basis of the present record and all prior proceedings of DRBC. Defendants' motions will be granted. The actions taken by DRBC will be held valid.

*Delaware River Basin Compact.*

Today, even in the relatively drought-free area of the Delaware ·River Basin, water is a scarce essential natural resource.[3] No longer is water freely available for the taking from the natural streams and the ground. Great rivers such as the Delaware are subject to vast withdrawals to slake the seemingly unquenchable thirst of modern technology and mankind. Compromise between legitimately competing interests for the use and enjoyment of natural free flowing rivers and the need for additional water to meet the demands of an industrialized expanding population are inevitable.

For many years, private and public entities, including cities and municipalities located along the banks of the Delaware River and its tributaries in the States of New York, New Jersey, Pennsylvania and Delaware, appropriated the waters of the Delaware River and its tributaries at will. Following the consent decree entered by the Supreme Court of the United States in *New Jersey v. New York,* 347 U.S. 995, 74 S.Ct. 861, 98 L.Ed. 1127 (1954), the four states involved in that litigation and the United States on November 2, 1961, executed a compact with respect to the water resources of the entire Delaware River watershed entitled "Delaware River Basin Compact" (Compact), which created the Delaware River Basin Commission.[4]

The preamble of the Compact grants DRBC broad responsibility and control over planning and allocating the water resources of the entire Delaware River Basin, including both surface and ground waters. The "heart" of the Compact is the mandate that DRBC initially prepare and thereafter from time to time review and revise a comprehensive plan for the immediate and long range development and use of the water

---

1. Approximately 9 mgd of the allocated 49 mgd for the NWRA projects would be divided approximately equally between water loss in transit and maintenance of additional downstream flow in the Neshaminy Creek.

2. Unopposed motions to intervene as parties defendant by PECO and NWRA were granted.

3. In or around January, 1980, the DRBC and various state and local governmental entities imposed stringent emergency water restrictions, some of which may still be in effect.

4. Unlike most interstate compacts where Congress merely "consents" to an interstate compact pursuant to Article 1, Section 10, Clause 3 of the United States Constitution, the federal government became a formal signatory member, subject to various express conditions and reservations. Pub.L.No. 87–328, 75 Stat. 688. Those reservations are set forth in § 15.1 of the Compact.

resources of the Delaware River basin, including both surface and ground waters. Sections 3.2 and 13.1 of the Compact. It is apparent from the wording of the Compact that the contracting parties contemplated that DRBC would constantly and continuously study and monitor the water resources and water needs and that the comprehensive plan, including water allocations and approval of projects utilizing water, would be in a status of unceasing up-dating and change.[5]

5. The preamble, Part I of the Compact, provides, in full, as follows:

Whereas the signatory parties recognize the water and related resources of the Delaware River Basin as regional assets vested with local, State, and National interests, for which they have a joint responsibility; and

Whereas the conservation, utilization, and development, management, and control of the water and related resources of the Delaware River Basin under a comprehensive multi-purpose plan will bring the greatest benefits and produce the most efficient service in the public welfare; and

Whereas such a comprehensive plan administered by a basin-wide agency will provide effective flood damage reduction; conservation and development of ground and surface water supply for municipal, industrial, and agricultural uses; development of recreational facilities in relation to reservoirs, lakes, and streams; propagation of fish and game; promotion of related forestry, soil conservation, and watershed projects; protection and aid to fisheries dependent upon water resources; development of hydroelectric power potentialities; improved navigation; control of the movement of salt water; abatement and control of stream pollution; and regulation of stream flows toward the attainment of these goals; and

Whereas decisions of the United States Supreme Court relating to the waters of the basin have confirmed the interstate regional character of the water resources of the Delaware River Basin, and the United States Corps of Engineers has in a prior report on the Delaware River Basin (House Document 179, Seventy-third Congress, second session) officially recognized the need for an interstate agency and the economies that can result from unified development and control of the water resources of the basin; and

Whereas the water resources of the basin are presently subject to the duplicating, overlapping, and uncoordinated administration of some forty-three State agencies, fourteen interstate agencies, and nineteen Federal agencies which exercise a multiplicity of powers and duties resulting in a splintering of authority and responsibilities; and

Whereas the joint advisory body known as the Interstate Commission on the Delaware River Basin (INCODEL), created by the respective commissions or Committee on Interstate Cooperation of the States of Delaware, New Jersey, New York, and Pennsylvania, has on the basis of its extensive investigations, surveys, and studies concluded that regional development of the Delaware River Basin is feasible, advisable, and urgently needed; and has recommended that an interstate compact with Federal participation be consummated to this end; and

Whereas the Congress of the United States and the executive branch of the Government have recognized the national interest in the Delaware River Basin by authorizing and directing the Corps of Engineers, Department of the Army, to make a comprehensive survey and report on the water and related resources of the Delaware River Basin, enlisting the technical aid and planning participation of many Federal, State, and municipal agencies dealing with the waters of the basin, and in particular the Federal Departments of Agriculture, Commerce, Health, Education, and Welfare, and Interior, and the Federal Power Commission; and

Whereas some twenty-two million people of the United States at present live and work in the region of the Delaware River Basin and its environs, and the government, employment, industry, and economic development of the entire region and the health, safety, and general welfare of its population are and will continue to be vitally affected by the use, conservation, management, and control of the water and related resources of the Delaware River Basin; and

Whereas demands upon the waters and related resources of the basin are expected to mount rapidly because of the anticipated increase in the population of the region projected to reach thirty million by 1980 and forty million by 2010, and because of the anticipated increase in industrial growth projected to double by 1980; and

Whereas water resources planning and development is technical, complex, and expensive, and has often required fifteen to twenty years from the conception to the completion of a large dam and reservoir; and

Whereas the public interest requires that facilities must be ready and operative when needed, to avoid the catastrophe of unexpected floods or prolonged drought, and for other purposes; and

Whereas the Delaware River Basin Advisory Committee, a temporary body constituted by the Governors of the four basin States and the mayors of the cities of New York and Philadelphia, has prepared a draft of an interstate-Federal compact for the creation of a

Article 2 of the Compact creates the Delaware River Basin Commission as "an agency and instrumentality of the governments of the respective signatory parties." Each of the four governors is an ex officio member who "shall appoint an alternate." The President appoints a representative on behalf of the United States.[6] The Act of Congress, Pub.L.No.87–328, 75 Stat. 688, provides in substance that when the United States representative on the Commission concurs in any revision of the comprehensive plan, no other federal officer or agency shall take any action with regard to water and related land resources in the Delaware River basin that substantially conflicts with the Comprehensive Plan.[7] The United States representative affirmatively concurred in the contested DRBC actions in this case.

Article 13 of the Compact, as well as § 3.2, mandates that a comprehensive plan be adopted and reviewed and revised. Section 13.1 provides:

The commission shall develop and adopt, and may from time to time review and revise, a comprehensive plan for the immediate and long range development and use of the water resources of the basin. The plan shall include all public and private projects and facilities which are required, in the judgment of the commission, for the optimum planning, development, conservation, utilization, management and control of the water resources of the basin to meet present and future needs; provided that the plan shall include any projects required to conform with any present or future decree or judgment of any court of competent jurisdiction. The commission may adopt a comprehensive plan or any revision thereof in such part or parts as it may deem appropriate, provided that before the adoption of the plan or any part or revision thereof the commission shall consult with water users and interested public bodies and public utilities and shall consider and give due regard to the findings and recommendations of the various agencies of the signatory parties and their political subdivisions. The commission shall conduct public hearings with respect to the comprehensive plan prior to the adoption of the plan or any part of the revision thereof.

Article 3 contains the Commission's powers and duties. Section 3.8 contains the provision under which PECO and NWRA sought to have the necessary facilities and the accompanying water allocations approved. Section 3.8 entitled "Referral and Review" requires that no project having a substantial effect on the water resources of the basin shall be undertaken unless the project is first submitted to and approved

basin agency, and the signatory parties desire to effectuate the purposes thereof: Now therefore

The states of Delaware, New Jersey and New York and the Commonwealth of Pennsylvania, and the United States of America hereby solemnly covenant and agree with each other, upon the enactment of concurrent legislation by the Congress of the United States and by the respective state legislatures, having the same effect as this Part, to the following Compact:

 . . . .

6. The federal representative is the Secretary of Interior.

7. The United States Reservations to the Compact are set out in § 15.1 of the Compact. Section 15.1(s) 1 provides, in part:
 Nothing contained in this Act or in the Compact shall impair or affect the constitutional authority of the United States or any of its powers, rights, functions, or jurisdiction under other existing or future legislation in and over the area or waters which are the subject of the Compact including projects of the commission: *Provided*, That whenever a comprehensive plan, or any part or revision thereof, has been adopted with the concurrence of the member appointed by the President, the exercise of any powers conferred by law on any officer, agency or instrumentality of the United States with regard to water and related land resources in the Delaware River Basin shall not substantially conflict with any such portion of such comprehensive plan and the provisions of Section 3.8 and Article 11 of the Compact shall be applicable to the extent necessary to avoid such substantial conflict:

 . . . .

by the Commission. In so doing, the Commission may allocate water, in accordance with the doctrine of equitable apportionment (§ 3.3), subject however to the consent decree of the United States Supreme Court in *New Jersey v. New York*, 347 U.S. 995, 74 S.Ct. 861, 98 L.Ed. 1127 (1954) (§ 3.5). Section 3.8, in its entirety, is as follows:

> *Referral and Review.* No project having a substantial effect on the water resources of the basin shall hereafter be undertaken by any person, corporation or governmental authority unless it shall have been first submitted to and approved by the commission, subject to the provisions of Sections 3.3 and 3.5. The commission shall approve a project whenever it finds and determines that such project would not substantially impair or conflict with the comprehensive plan and may modify and approve as modified, or may disapprove any such project whenever it finds and determines that the project would substantially impair or conflict with such plan. The commission shall provide by regulation for the procedure of submission, review and consideration of projects, and for its determinations pursuant to this section. Any determination of the commission hereunder shall be subject to judicial review in any court of competent jurisdiction.

*Historical Summary of Proposed Projects.*

The proposed projects provide for a pumping station at Point Pleasant, Pennsylvania, with a design capacity to withdraw a maximum of 95 mgd of water from an intake point located in the Delaware River. The water thus withdrawn will be pumped through a single underground transmission line approximately 2½ miles to a storage reservoir to be built on approximately 28 acres of land, designated as Bradshaw Reservoir. A smaller transmission line with capability of connecting with the large main and the Bradshaw Reservoir will transport a maximum of 49 mgd, by gravity flow approximately one mile to the headwaters of the North Branch of the Neshaminy Creek, from whence the water will flow into Lake Galena, a multi-purpose dam on the North Branch. Controlled releases from Lake Galena will continue downstream to the NWRA water treatment plant at the juncture of the North Branch of the Neshaminy Creek and Pine Run at Chalfont, Pennsylvania. The treatment plant's maximum capacity for water, to be withdrawn from both the North Branch and Pine Run, will be 40 mgd. From the water treatment plant, NWRA transmission lines will extend South and West (initially) and eventually also North and East for public water supplies. Another transmission line, to be constructed by PECO, will go from the Bradshaw Reservoir by a pumping force approximately 6.7 miles along an existing public utility right-of-way to the headwaters of the East Branch of the Perkiomen Creek. This transmission line will have a permitted maximum capacity of 46 mgd. The water will flow downstream to a point where the East Branch joins the Perkiomen Creek. At this junction point, another PECO transmission line, heretofore approved, will carry water to the Limerick plant located along the Schuylkill River.[8] A copy of a plan contained in the final environmental assessment is attached for reference following:

---

8. The Perkiomen Creek flows into the Schuylkill River below Limerick. The Schuylkill River flows into the Delaware River in South Philadelphia, and the Neshaminy Creek flows into the Delaware River a short distance north of Philadelphia. Both the Neshaminy and the Schuylkill enter the Delaware downstream from Point Pleasant, Pennsylvania.

NESHAMINY WATER SUPPLY SYSTEM

 In 1966 the Pennsylvania Department of Forests and Waters (now Department of Environmental Resources), the U. S. Department of Agriculture-Soil Conservation Service and the Counties of Bucks and Montgomery of Pennsylvania prepared a joint study and report on the water supply in the Neshaminy Creek basin. The report contemplated the construction of a series of ten flood-control and/or multi-purpose dams on the Neshaminy Creek and its tributaries, and two pumping stations, one at Point Pleasant and the other at Yardley[9] on the Delaware River to supplement the surface waters of the Neshaminy Creek and its tributaries. As a part of this early plan, the construction of a multi-purpose dam on the North Branch of the Neshaminy Creek creating an impoundment designated as Lake Galena was contemplated together with a "taking" of water for public use from the North Branch at or near Chalfont, Bucks County, Pennsylvania, where the North Branch and Pine Run converge. This fundamental concept and project was approved by DRBC and added to the Comprehensive Plan on October 26, 1966.[10] The present DRBC approval of NWRA's application pursuant to § 3.8 of the compact— the subject matter of this lawsuit—is basically a final approval for the construction of the pumping station, the conduits and the water-treatment facilities as originally

**9.** One of plaintiffs' contentions is that DRBC failed to consider the Yardley pumping station in its environmental assessment. It was specifically considered (See Final Environment Assessment for the Neshaminy Water Supply System Part IV at IV–8 to IV–9 (August 1980)). The need for the Yardley pumping station for public water use for Bucks County has been eliminated by NWRA because lower Bucks

County public water needs have been adequately augmented by an agreement with the City of Philadelphia, whereby water from the Philadelphia Torresdale pumping station is sold to NWRA.

**10.** This addition to the Comprehensive Plan is Docket No. D–65–76 CP entitled "Neshaminy Creek Watershed Project, Bucks and Montgomery Counties, Penna."

contemplated and included in the Comprehensive Plan in 1966.[11]

Following the 1966 addition of the Neshaminy Creek project to the Comprehensive Plan, there have been continuing studies and revisions and refinements of details of the Plan, but apparently no change in the basic concept, except for the present reduction in the quantity of water to be withdrawn from the Delaware River.

On December 8, 1970, the Pennsylvania Water and Power Resources Board issued a water allocation permit No. WA–649 to Bucks County to withdraw up to a maximum of seventy-five (75) mgd from the Delaware River at Point Pleasant, Pennsylvania, for the Neshaminy Creek project. On January 29, 1971, the North Branch Water Treatment plant at Chalfont, Pennsylvania, was added to the Comprehensive Plan (Docket No. D–70–242 CP). On March 17, 1971, the Point Pleasant pumping station was added to the Comprehensive Plan with a contemplated water total maximum allowable withdrawal for both Limerick and NWRA of approximately 150 mgd. Formal § 3.8 approval of the necessary construction facilities was deferred pending submission of final plans by NWRA. In connection with the 1971 amendments to the Comprehensive Plan, DRBC prepared a "Final Statement—Environmental Impact of the Proposed Pt. Pleasant Diversion Plan, Bucks and Montgomery Counties, Pennsylvania," in accordance with provisions of the then recently enacted (January 1, 1970) National Environmental Policy Act (NEPA). *See* 42 U.S.C. §§ 4321–4347 (1976).

The "Final Statement" was subsequently supplemented, updated and expanded and submitted in February, 1973 by DRBC as a final environmental impact statement (FEIS) entitled "Point Pleasant Diversion Plan, Bucks and Montgomery Counties." This 1973 FEIS was submitted to the Council on Environmental Quality (CEQ) in compliance with the provisions of NEPA. The FEIS concluded that the proposed projects for water withdrawal at Point Pleasant for diversion to the Neshaminy watershed for public water use, and diversion to the Perkiomen watershed for additional cooling water for Limerick would be beneficial to the watersheds of both creeks and not detrimental to the Delaware River, provided various express conditions as to control and use of the water were enforced.

Because implementation of the Neshaminy Creek portion of the project through commencement of construction was not then immediately practical, continuing studies were made by various entities as to the present and contemplated future water needs, particularly in central portions of Bucks and Montgomery Counties. A Master Plan for Bucks County Water Supply completed in 1972 was updated in 1975 through the joint efforts of Bucks and Montgomery Counties, the Pennsylvania Department of Energy, the Bucks County Water and Sewer Authority, the Delaware Valley Regional Planning Commission, and an NWRA environmental report.

Design work on the proposed Chalfont water treatment plant began in 1975 but was suspended when studies including the updated "Master Plan" projected a smaller need quantitatively for present and future public water use in Central Bucks County, due primarily to lower projections as to future population growth in the area. The end result was that the water treatment plant was downscaled from a future maximum capacity of 80 mgd to 40 mgd. This, in substance, caused the total demand for water to be withdrawn from the Delaware River at Point Pleasant to be reduced from approximately 150 mgd maximum, to the present 95 mgd maximum for both the NWRA and PECO projects involved in this litigation.[12]

---

11. The present docket in dispute as to the NWRA application is Docket No. D–65–76 CP (8), which apparently refers to the eighth addition, revision and/or amendment to the original Neshaminy Creek watershed project.

12. The contemplated flow of 46 mgd maximum to the Perkiomen watershed remained about the same. The reduced needs for the NWRA treatment plant at Chalfont also reduced the estimated loss in transit and some reduction in additional water for downstream flowage be-

In 1973 the United States Atomic Energy Commission (AEC) prepared an FEIS on "Limerick Generating Station, Units 1 and 2." This FEIS contained provision for withdrawal of water from the Delaware River at Point Pleasant, and transporting it to Limerick as additional cooling water through use of transmission lines and the natural water courses of the Perkiomen Creek watershed.

In April of 1976, the United States Department of Agriculture, Soil Conservation Service prepared an FEIS entitled "Neshaminy Creek Watershed." Again, the proposed plan provided for water withdrawal from the Delaware River at Point Pleasant for transportation to the Neshaminy watershed as additional water for public use. It encompassed the plans of Bucks County and NWRA for the entire Neshaminy watershed.

On January 27, 1979, PECO filed application pursuant to § 3.8 of the Compact for approval to commence construction of its portions of the Point Pleasant pumping station, Bradshaw Reservoir, and transmission lines to the Perkiomen Creek. On July 5, 1979, NWRA filed application pursuant to § 3.8 of the Compact for approval to commence construction of its portions of the Point Pleasant pumping station, the water treatment plant at Chalfont and the various transmission lines. Both § 3.8 applications were supported by detailed "environmental reports," prepared by the applicants as required by DRBC regulations §§ 2–4.2 and 2–4.3.

DRBC had available to it three final environmental impact statements, together with all the supporting data, as of the time it received the present PECO and NWRA applications. They were: (1) "Pt. Pleasant Diversion Plan, Bucks and Montgomery Counties," submitted by DRBC in 1973; (2) "Limerick Generating Station, Units 1 and 2," submitted by the AEC in 1973; (3) "Neshaminy Creek Watershed," submitted by U. S. Department of Agriculture, Soil

and Conservation Service in 1976. Each of these plans incorporated the concept of a withdrawal of a maximum of 150 mgd of water at Point Pleasant, a distribution of a maximum of 46 mgd to the Perkiomen Creek for use as additional cooling water at Limerick, and the balance of the water to flow into the headwaters of the Neshaminy watershed with a withdrawal of approximately an equal quantity of water at Chalfont for water treatment and distribution for public consumption in sections of Bucks and Montgomery Counties.

In June of 1974, the Nuclear Regulatory Commission (NRC) granted a construction permit to PECO for the Limerick plant. This was subsequent to the completion of the FEIS prepared by DRBC in 1973 and the FEIS prepared by the AEC in 1973. The validity of the construction permit was challenged through court proceedings where specific objections were raised as to the adequacy of the two mentioned FEIS's in relation to the water supply aspects of the Limerick project. The Court of Appeals for the Third Circuit, in an unpublished judgment order, affirmed the issuance of the construction license. *Environmental Coalition of Nuclear Power et al. v. Nuclear Regulatory Commission and Philadelphia Electric Co.*, No. 75–1421 (3d Cir. Nov. 12, 1975).

Pursuant to DRBC's regulations on processing § 3.8 applications, DRBC prepared for the present applications an environmental assessment on the projects. The Executive Director of DRBC, on the basis of the environmental assessment, recommended a "negative declaration," based on his conclusion that the proposed projects would have no significant adverse impacts on the environment. A "negative declaration" would, if valid, do away with the necessity of preparing another FEIS on the projects, and submitting the same to the CEQ. Public notice of intent to issue a negative declaration and of the preparation of the environmental assessment was given and public

---

low Chalfont. Of the water to go to the Neshaminy watershed, approximately 40 mgd would be for the Chalfont treatment plant, 4.5 mgd

loss in transit and 4.5 mgd for additional downstream flowage below Chalfont.

hearings were held by DRBC on the § 3.8 applications on November 18, 1980 and on December 12, 1980.

In August, 1980, DRBC prepared and published a "Final Environmental Assessment For the Neshaminy Water Supply System" project sponsored by NWRA and PECO. This document contained approximately 230 pages, with cross-references and references by incorporation to voluminous documents, studies, reports and comments by individuals and public and private organizations. On February 18, 1981, DRBC granted the § 3.8 applications of both PECO and NWRA, subject to certain express conditions and limitations.[13] The construction details of the projects were added to the Comprehensive Plan to the extent that such details were contained in the applications and had not previously been approved and included in the prior actions of DRBC.

The foregoing is a very brief outline of some of the significant prior procedures. A study of the record and admitted factual background of this case makes abundantly certain that the final plan that has now been granted approval by DRBC for construction has been (1) subject to almost constant study by many public and private entities for at least fifteen years last past; (2) approved and included in the DRBC Comprehensive Plan in substantial concept for many years; (3) the subject of at least three FEIS's by three different agencies.[14]

The primary issue raised in this litigation is the plaintiffs' contention that before DRBC could validly approve the § 3.8 applications of either or both PECO and NWRA, a new and full environmental impact statement must be prepared with the attendant procedures mandated by NEPA. Subsidiary to this issue is the validity of the "negative declaration" of DRBC. The position of DRBC and of the intervenor defendants, in substance, is that all environmental issues were fully considered in prior environmental impact statements, and that the present facilities authorized by the § 3.8 approvals merely downscale the size of previously approved projects. Because the smaller size will have less adverse impacts on the environment, defendants assert that the negative declaration is fully justified. In addition, defendants contend that every conceivable environmental impact has been fully studied and was carefully considered by DRBC in the environmental assessment prepared for the present applications and in the prior FEIS's. Defendants contend that there has been more than adequate public notice and participation and that all appropriate governmental agencies have been notified and the responses of such agencies were carefully considered prior to the approvals granted on February 18, 1981. Finally, defendants contend all requirements of the law have been met and that DRBC in good faith objectively took a "hard look" at the environmental consequences and alternatives.

### Application of NEPA to Actions by DRBC.

Plaintiffs contend that for purposes of this litigation, all of the provisions of NEPA apply to DRBC's approvals of the PECO and NWRA § 3.8 applications. The defendants, including intervenor-defendants PECO and NWRA, do not dispute this contention apparently because the regulations of DRBC applicable to processing § 3.8 applications provide all of the procedural safeguards of NEPA.

That DRBC is a federal agency for purposes of NEPA is very doubtful. 42 U.S.C. § 4332(2)(C) requires that an environmental impact statement be prepared as to all "major Federal actions significantly affecting the quality of the human environment." The Commission, formed by a compact among four states and the United States Government as co-equal members, would not appear to be a federal agency, nor

---

13. The present law suit was filed on November 18, 1980, but DRBC was not prohibited from continuing with the processing of the NWRA and PECO § 3.8 applications.

14. The NRC has announced that before PECO will be granted authorization to operate Limerick after construction is completed, another EIS as to operation will be required.

would actions of DRBC appear to be "Federal." Arguably, to the extent that the United States' member of the Commission votes in favor of an application or otherwise acquiesces in accordance with the Compact, such approval might be deemed "Federal action" which, if of sufficient importance, could constitute "major Federal action."

In *Borough of Morrisville v. Delaware River Basin Commission*, 399 F.Supp. 469 (E.D.Pa.1975), aff'd, 532 F.2d 745 (3d Cir. 1976), Judge Newcomer of this Court, without expressly ruling on the applicability of NEPA, determined that DRBC's resolution imposing a charge for use of surface water was adopted after full compliance with NEPA. Judge Newcomer thereby suggested, at least, that DRBC is subject to the provisions of NEPA.

Because DRBC regulations in substance adopt all NEPA requirements, and possibly some additional procedural steps, the issue as to whether NEPA is applicable to DRBC need not be presently decided. In addition, defendants apparently concede that if the "negative declaration" is invalid, a full FEIS would be required.

### Scope of Review.

The compact provides that any determination made by the Commission in reference to a § 3.8 application "shall be subject to judicial review in any court of competent jurisdiction." Section 15.1 of the Compact contains the express reservations under which the United States by Act of Congress, Pub.L. 87–328, 75 Stat. 688, became a signatory. Reservation(p) of § 15.1 provides that "[t]he United States district courts shall have original jurisdiction of all cases or controversies arising under the Compact, and this Act . . . ." This controversy arises under the Compact, and under the laws of the United States—thus, there is jurisdiction under 28 U.S.C. § 1331. The § 3.8 projects approved by the Commission all involve construction to be performed wholly within this federal judicial district— making venue proper in this district. 28 U.S.C. § 1391.

Far less certain are the procedures and standards by which the substantive issues of this case are to be determined—an issue referred to by counsel as the "scope of review." Scope of review has at least two distinct aspects: (1) the legal standards by which the DRBC action is to be judged, and (2) the record and procedure by which the DRBC action is to be judged.

All defendants contend that this court may review only the Commission's record as it presently exists to determine if the contested action by DRBC is valid. Although plaintiffs concede that a "de novo" hearing to determine if correct decisions were made by DRBC would not be required or proper, they assert that they have the right to present evidence as to certain facts which they contend are material and in dispute.

Several tests have been suggested as to the standard of review. All parties seem to agree that if the action was arbitrary and capricious or otherwise not in accordance with law, such action would be invalid. Defendants primarily contend that the "arbitrary and capricious" standard is the proper standard of review. There is however, authority in case law suggesting that the reviewing court should, in addition, determine if there was "substantial evidence" to support the action, and/or whether the action had a "reasonable basis" in fact and in law.

The Administrative Procedure Act (APA), 5 U.S.C. § 551–559, does not apply. Among the express reservations of the United States, § 15.1(m) of the Compact, is a provision that DRBC "shall not be considered a Federal agency" for purposes of certain statutes, among which is the Act of June 11, 1946, Pub.L.No.404, 60 Stat. 237, as amended, which statute was the predecessor to the APA. Analysis of cases decided under provisions of the APA may, nevertheless, be helpful, but not necessarily controlling as to the scope of judicial review by this Court.

In one of the few decided cases reviewing action of DRBC, Judge Fullam addressed the issue, but ruled only that a de novo review would not be appropriate. *Dublin Water Co. v. Delaware River Basin Com-*

*mission,* Civil Action 78–3665 (E.D.Pa. March 5, 1980) (unreported). He stated in rendering the opinion:

> Although the Commission's orders are specifically made reviewable by "any court of competent jurisdiction," the standard of review is not specified. Counsel for both sides have expressed uncertainty concerning the correct standard of review. The Administrative Procedure Act probably does not apply, except perhaps by analogy. It seems reasonably clear, however, that *de novo* review of the administrative findings would not be appropriate. And I am satisfied that, under any other standard of review applicable to administrative determinations, the Commission's orders must be sustained. That is, whether the test is substantial evidentiary support, abuse of discretion, or a determination as to arbitrariness and capriciousness, the findings and decision of the Commission cannot be disturbed.

Judge Fullam's decision was affirmed by a judgment order of the Court of Appeals for the Third Circuit on March 18, 1981.

In *Borough of Morrisville v. Delaware River Basin Commission,* 399 F.Supp. 469, 478 (E.D.Pa.1975), *aff'd,* 532 F.2d 745 (3d Cir. 1976), Judge Newcomer, assuming that NEPA, as well as the Commission's own regulations, applied as to whether an environmental impact statement was required, in determining the validity of a "negative declaration" by the Commission, stated as follows:

> Neither the Supreme Court nor this Circuit has passed upon the standard that a District Court should apply in reviewing an agency's decision that no environmental impact statement is required, and those Circuits which have ruled on the matter have split along three lines. Some Circuits have stated that the agency's negative determination would be upheld if it was not "arbitrary or capricious." *First National Bank of Chicago v. Richardson,* 484 F.2d 1369 (7th Cir. 1973); *Rucker v. Willis,* 484 F.2d 158 (4th Cir. 1973); *Hanly v. Kleindienst,* 471 F.2d 823, (2nd Cir. 1972). Other Circuits have adopted a more stringent "reasonableness" test under which an agency's negative determination will be sustained where there is supporting evidence in the record and a reasonable basis in law. *Minnesota Public Interest Research Group v. Butz,* 498 F.2d 1314 (8th Cir. 1974); *Wyoming Outdoor Coordinating Council v. Butz,* 484 F.2d 1244 (10th Cir. 1973); *Save Our Ten Acres v. Kreger,* 472 F.2d 463 (5th Cir. 1973). The District of Columbia Circuit has endorsed neither the "reasonableness" test nor the "arbitrary and capricious" test. Instead it has adopted a test suggested by Judge Friendly in his dissenting opinion in Hanly, cited *supra.* Under this test, an agency's assessment must provide convincing reasons that "arguably" potentially significant impacts do not require a detailed environmental impact statement. *Maryland-National Capital Park and Planning Commission v. Postal Service,* 159 U.S. App.D.C. 158, 487 F.2d 1029 (1973).

 While this Court believes, for the reasons set forth *Wyoming Outdoor Coordinating Council v. Butz, cited supra,* that a higher standard of review than the "arbitrary and capricious test" is required in NEPA cases, the Commission's treatment of the environmental impact of the charges themselves clearly passes muster under any of the three standards outlined above. . . .

*Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 413–14, 91 S.Ct. 814, 822, 28 L.Ed.2d 136 (1971), ruled that in reviewing federal agency action subject to the provisions of the APA:

> In all cases the agency action must be set aside if the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or if the action failed to meet statutory, procedural, or constitutional requirements. . . .
> In certain narrow, specifically limited situations, the agency action is to be set aside if the action was not supported by "substantial evidence." And in other equally narrow circumstances the reviewing court is to engage in a *de novo* review

of the action and set it aside if it was "unwarranted by the facts."

In *Overton Park, supra* at 414, 91 S.Ct. at 822, the Court further explained that the "substantial evidence" test is authorized only when agency action is taken pursuant to a rulemaking provision of the APA, 5 U.S.C. § 553, or when agency action is based on a public adjudicatory hearing. Although there were public hearings prior to DRBC issuing the "negative declaration" and approving the present § 3.8 applications, no adjudicatory hearing was held or required.

The only adjudicatory type of hearing ever held in respect to any phase of the proposed projects arose out of the construction permit for the Limerick plant issued by the NRC, which matter, as previously noted, was fully litigated and the grant of the license upheld on appeal by the Court of Appeals for the Third Circuit in 1975.[15]

According to *Overton Park, supra* at 415, 91 S.Ct. at 823, a de novo review applies only if the action is adjudicatory in nature and the agency fact-finding procedures are inadequate or when issues, not before the agency, are raised in a proceeding to enforce nonadjudicatory agency action.

By analogy with *Overton Park*, the test would appear to be whether the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Despite the limited nature of such a review, it does require the Court to engage in a substantial inquiry. There should be a "thorough, probing, in-depth review." *Overton Park, supra* at 415, 91 S.Ct. at 823. First, there should be inquiry as to whether the agency (in this case DRBC) acted within the scope of its authority. Plaintiffs do not contend that the § 3.8 approvals were beyond the scope of DRBC's authority. The court must further consider whether the decision of the agency "was based on a consideration of the relevant factors and whether there has been a clear error of judgment, bearing in mind that the court is not empowered to substitute its judgment for that of the agency. Finally, the court must determine if necessary procedural requirements were followed.

Since the Compact gives no hint of the scope of review and the APA is expressly not applicable, the case of *United States v. Bianchi & Co.*, 373 U.S. 709, 715, 83 S.Ct. 1409, 1413, 10 L.Ed.2d 652 (1963), gives some guidance. That case, as I understand it, strongly suggests that in the absence of statutory standards the test is either "arbitrary and capricious" or "not substantial evidence," and, more importantly, that review should be limited to the administrative record. The *Bianchi* Court stated that the "substantial evidence" standard goes to the reasonableness of the agency action on the basis of the record before it:

> Indeed, in cases where Congress has simply provided for review, without setting forth the standards to be used or the procedures to be followed, this Court has held that consideration is to be confined to the administrative record and that no *de novo* proceeding may be held. *Tagg Bros. & Moorhead v. United States*, 280 U.S. 420 [50 S.Ct. 220, 74 L.Ed. 524]; *National Broadcasting Co. v. United States,* 319 U.S. 190, 227 [63 S.Ct. 997, 1014, 87 L.Ed. 1344]. And of course, as shown by the *Tagg Bros.* and *NBC* cases themselves, the function of reviewing an administrative decision can be and frequently is performed by a court of original jurisdiction as well as by an appellate tribunal.

> Moreover, the standards of review adopted in the Wunderlich Act—"arbitrary," "capricious," and "not supported by substantial evidence"—have frequently been used by Congress and have consistently been associated with a review limited to the administrative record. The term "substantial evidence" in particular has become a term of art to describe the basis on which an administrative record is to be judged by a reviewing court. This

---

**15.** *Environmental Coalition of Nuclear Power, et al. v. NRC and PECO*, No. 75–1421 (3d Cir. Nov. 12, 1975).

standard goes to the reasonableness of what the agency did *on the basis of the evidence before it,* for a decision may be supported by substantial evidence even though it could be refuted by other evidence that was not presented to the decision-making body.

*Id.* at 715, 83 S.Ct. at 1413 (emphasis in original) (footnote omitted).

Many, if not most cases, that have been confronted with a choice between applying an "arbitrary and capricious" and a "substantial evidence" standard of review of agency action have neatly side-stepped the issue by ruling that the same result would obtain under the facts of the case being decided, under either test.[16]

Before attempting to apply some possibly artificial standard to the facts of this case, it may be more helpful to consider the precise issues. Plaintiffs have launched a broad-scale attack on the action of DRBC, but the fundamental issue is whether another FEIS was required prior to approval of the § 3.8 applications. In substance, the dispute between the parties is whether the changes that have occurred since the 1973 FEIS of the DRBC and the 1973 FEIS of the AEC and the 1976 FEIS of the Soil and Conservation Service are so substantial as to require an entirely new FEIS. A study of some of the decided cases under NEPA is helpful.

In *Aberdeen & Rockfish R. R. v. SCRAP,* 422 U.S. 289, 319, 95 S.Ct. 2336, 2355, 45 L.Ed.2d 191 (1975),[17] the Supreme Court set the general purpose of NEPA as imposing procedural, as distinct from substantive requirements upon government agencies.

NEPA does create a discrete procedural obligation on Governmental agencies to give written consideration of environmental issues in connection with certain major federal actions and a right of action in adversely affected parties to enforce that obligation.

Several years later, the Supreme Court again emphasized that the NEPA requirements were essentially procedural. *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978):

NEPA does set forth significant substantive goals for the Nation, but its mandate to the agencies is essentially procedural. See 42 U.S.C. § 4332. See also *Aberdeen & Rockfish R. Co. v. SCRAP,* 422 U.S. [289] at 319 [95 S.Ct. 2336, at 2355, 45 L.Ed.2d 191] [1975]. It is to insure a fully informed and well-considered decision, not necessarily a decision the judges of the Court of Appeals or of this Court would have reached had they been members of the decisionmaking unit of the agency.

The procedural aspects of NEPA were reiterated by the Supreme Court in *Strycker's Bay Neighborhood Council, Inc. v. Karlen,* 444 U.S. 223, 227–28, 100 S.Ct. 497, 499–500, 62 L.Ed.2d 433 (1980):

In *Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 558 [98 S.Ct. 1197, 1219, 55 L.Ed.2d 460] (1978), we stated that NEPA, while establishing "significant substantive goals for the Nation," imposes upon agencies duties that are "essentially procedural." As we stressed in that case, NEPA was designed "to insure a fully-informed and well-considered decision," but not necessarily "a decision the judges of the Court of Appeals or of this Court would have reached had they been members of the decisionmaking unit of the agency." *Ibid. Vermont Yankee* cuts sharply against the Court of Appeals' conclusion that an agency, in selecting a course of action, must elevate environmental concerns over other appropriate considerations. On the contrary, once an agency has made a decision subject to NEPA's procedural requirements, the only role for a

---

16. *Cf., e.g., Dublin Water Co. v. Delaware River Basin Commission,* Civil Action 78–3665 (E.D.Pa. March 5, 1980) (unreported), *aff'd,* 649 F.2d 858 (3d Cir. 1981); *Borough of Morrisville v. Delaware River Basin Commission,* 399

F.Supp. 469 (E.D.Pa.1975), *aff'd,* 532 F.2d 745 (3d Cir. 1976).

17. Generally referred to as "SCRAP II."

court is to insure that the agency has considered the environmental consequences; it cannot " 'interject itself within the area of discretion of the executive as to the choice of the action to be taken.' " *Kleppe v. Sierra Club*, 427 U.S. 390, 410, n.21 [96 S.Ct. 2718, 2730, 49 L.Ed.2d 576] (1976). See also *FPC v. Transcontinental Gas Pipe Line Corp.*, 423 U.S. 326 [96 S.Ct. 579, 46 L.Ed.2d 533] (1976).

I conclude, based on the decided cases, that in deciding whether DRBC validly approved and granted the § 3.8 applications of NWRA and PECO, the tests to be applied are (1) whether DRBC complied with all applicable statutes and regulations, (2) whether DRBC carefully considered the environmental consequences based upon the information before it, and (3) whether the information provided to DRBC before it acted was sufficient for DRBC to make a well-considered decision. Whether the action taken by DRBC meets these tests should be determined objectively from the record, which should show "written consideration of the environmental issues." See *SCRAP II, supra.*

### Negative Declaration.

The "detailed statement" as to environmental consequences that is required under NEPA comes into play only where agency action either (1) recommends or reports on proposals for legislation,[18] or (2) is a major federal action significantly affecting the quality of the human environment. Thus, in the context of this case, for the requirement of NEPA that a "detailed statement" be prepared, the action must be major and must significantly affect the quality of the human environment.

The "detailed statement," where required, must be on (1) the environmental impact of the proposed action, (2) the environmental effects which cannot be avoided should the proposal be implemented, (3) possible alternatives, (4) the "relationship between short-term uses of man's environment and the maintenance and enhance-

ment of long-term productivity" and (5) irreversible and irretrievable commitments of resources if the proposal is implemented. This "detailed statement" has been given the designated name of an "environmental impact statement" although that nomenclature does not appear in the statute. Additionally, except for the five matters that must be included in the statement and that the statement be "detailed," the statute spells out no particular format, and procedurally requires only that the agency "consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved." Comments and views received from other Federal agencies are to accompany the statement and all agency review process, and made available to the CEQ. 42 U.S.C. § 4332(2)(C). The statute does not require public notice or comment.

The statute has been subject to extensive regulations by CEQ. The regulations adopted by DRBC for processing its own environmental impact statements are entirely consistent with the NEPA regulations adopted by CEQ so far as counsel and this court have been able to ascertain. Because the DRBC regulations have direct bearing on procedures of § 3.8 applications, reference will be made to both NEPA and DRBC regulations.

Under NEPA regulations, the initial determination is whether an environmental impact statement must be prepared. Section 1501.4 of the CEQ regulations provides that the agency should first determine whether the proposed action normally requires an EIS. 40 C.F.R. § 1501.4. If not, then in all cases an "Environmental Assessment" must be made wherein "environmental agencies, applicants, and the public, to the extent practical" shall be involved in preparing the assessment.

DRBC regulations provide that under certain circumstances an applicant for § 3.8 action must submit an "environmental re-

---

**18.** Inapplicable in this case.

port" with the application. Such report was filed by the applicants in this case. After receipt of such a report, the executive director of DRBC [19] is required to prepare an "environmental assessment." [20] The environmental assessment was published February 15, 1980. It concluded that a negative declaration would be proper. A notice of intent to so declare was published in accordance with DRBC regulations. Approximately 400 letters of objection to the projects and/or the proposed "negative declaration" were received. On August 25, 1980, DRBC issued a Final Environmental Assessment in reference to the § 3.8 applications, and issued a negative declaration. Thereafter, public hearings were held on November 18, 1980 and December 12, 1980, although regulations apparently do not require a hearing.

The Final Environmental Assessment (FEA) issued on August 15, 1980, is a detailed document. A careful review of that document convinces me that its substantive content is sufficiently detailed and thorough to meet the substantive statutory requirements of 42 U.S.C. § 4332(2)(C), and contains adequate discussion of all of the five enumerated statutory particulars. [21] Likewise, the procedures utilized in preparing the so-called "Final Environmental Assessment" would have been adequate to comply with statutory and regulatory requirements for the preparation of a "Final Environmental Impact Statement." [22] Therefore, it would appear to me that, even if a procedural or substantive defect in the "negative declaration" exists, or that another FEIS should have been prepared, the document entitled the "Final Environmental Assessment" would suffice, at least substantively for all legal purposes as an FEIS.

The "negative declaration" issued with the final environmental assessment on August 25, 1980, concluded that "circumstances have not changed concerning the Authority's [NWRA] water supply system and the overall Point Pleasant project to such an extent as would require the preparation of another environmental impact statement."

*Final Environmental Assessment.*

Plaintiffs contend that the final environmental assessment fails to consider adequately all of the potential adverse environmental impacts of the overall plan to divert water from the Delaware River at Point Pleasant and to transport the water to the Perkiomen and Neshaminy watersheds for use by PECO at its Limerick generating plant and by NWRA for its water-treatment and distribution plant at Chalfont. Plaintiffs' argument appears to be that because of asserted deficiencies in the final environmental assessment, DRBC lacked the necessary information to conclude that a negative declaration was appropriate, hence, a full environmental impact statement became necessary.

Plaintiffs concede that the projects for which the present § 3.8 applications seek approval have all been included previously in the Comprehensive Plan "at various times," and that the present applications are merely revisions to heretofore approved

19. Defendant, Gerald M. Hansler is and was throughout all relevant time periods the executive director of DRBC.

20. NEPA regulations also require an environmental assessment prior to a decision not to prepare an EIS, but the DRBC requirement that applicants first submit an environmental report appears to be an additional requirement beyond that of NEPA.

21. The five particulars which must be addressed are as follows: "(i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action." 42 U.S.C. § 4332(2)(C).

22. However, I do not find in the record any evidence that a copy was sent to CEQ, which would be procedurally required of a "Final Environmental Impact Statement." Notice of intention to issue a negative declaration was, however, sent to CEQ.

portions of the Comprehensive Plan.[23] Plaintiffs contend that the environmental assessment, which is the foundation for the "negative declaration," limits itself "narrowly" to the specific § 3.8 projects, instead of giving full reconsideration to the overall environmental impacts of the entire water diversion plan, both as approved and as may be approved in the future by later additions such as the possible (but highly unlikely) downstream Yardley pumping station. Plaintiffs point out certain specific aspects of the overall plan which they assert were not sufficiently considered. However, they either concede or the record affirmatively establishes that each of the asserted deficiencies was referred to and considered in the final environmental assessment. Thus, this issue appears to condense itself into the degree of detail in which the information contained in the environmental assessment must be set forth.

As previously noted, the present § 3.8 applications provide additional detail and general construction plans for projects heretofore included in the Comprehensive Plan. The maximum amount of water that will be permitted to be withdrawn at Point Pleasant will be reduced from the 150 mgd as contained in the heretofore approved Comprehensive Plan to 95 mgd. Logic would seem to point to a lessening of any adverse environmental impacts by such reduction in size and capacity. Therefore, the decision to proceed with the approval without another complete environmental impact statement would appear, at least superficially, to be a "reasonable" decision. Certainly it could hardly be fairly described as "arbitrary" or "capricious" or one involving an "abuse of discretion." The decision to approve the § 3.8 applications by way of a "negative declaration" after a review of the environmental assessment was not lacking in a substantial factual basis, nor done without "substantial evidence" to support the conclusion. This is particularly true in view of the many prior studies, reports and/or environmental impact statements prepared by DRBC and other agencies.

Plaintiffs contend that the environmental assessment gives insufficient consideration to other facilities of the Neshaminy watershed and water supply system, that have either been constructed or planned. These include the flood and multi-purpose dams, the artificial lake impoundments (Nockamixon, Galena and Luxemborg), the Northern and Eastern water transmission lines from the Chalfont plant,[24] the Yardley pumping station and the Lower Bucks County water supply system (including the Langhorne treatment plant, Lake Luxemborg and the Philadelphia interconnection). Plaintiffs object to the terminology in the environmental assessment of certain facilities as being only "peripherally" related to the § 3.8 project applications, including the Pine Run reservoir and the proposed Merrill Creek Reservoir.[25] Although certain of

23. See Plaintiffs' memorandum of law in opposition to the motion to dismiss and for summary judgment at 4 and 5.

24. Section 3.8 approval for these lines has not been sought, but was considered in the environmental assessment. See Environmental Assessment, Part III 1–5, 1–6. If approval is sought in the future, another § 3.8 application would appear to be required.

25. The Merrill Creek reservoir, if constructed, would provide additional water for PECO's Limerick plant during periods of low flow in the Delaware River by allowing releases from the reservoir into the Delaware River to maintain required minimum flowage. DRBC's approval of PECO's application is expressly conditioned upon a continuing flow of 3000 cubic feet per second (3000 cfs) at the Trenton Station. This is the quantity of water that DRBC has determined is a safe limit to prevent the "salt line" of the Delaware River from encroaching farther upstream, a major environmental concern of some of the opponents to any plan calling for removal or diversion of any water from the Delaware River. If the water falls below 3000 cfs at Trenton, PECO cannot withdraw water at Point Pleasant for its Limerick plant during such periods of low flow. The Merrill Creek Reservoir is not required under the present plans, nor is it an essential or necessary adjunct. Plaintiffs question the validity of DRBC's determination that a flow of 3000 cfs at the Trenton station will preclude an upstream advance of the River's salinity or "salt line." The record shows constant and thorough study and consideration of the salinity problems of the Delaware River. Although experts, as well as laymen, may disagree as to a "safe" rate of flow, DRBC is the agency

these facilities may have been designated as "peripheral" (Environmental Assessment Part II at 12–13), they were extensively discussed in the environmental assessment and cross-referenced materials.

In effect, plaintiffs seek to reopen and challenge portions of the Comprehensive Plan that have long been approved. It is plain from the complaint and plaintiffs' briefs and argument that they disagree with the basic concept of diverting water from the Delaware River for the two projects, although the immediate relief sought is a declaration that the § 3.8 approvals are procedurally invalid because DRBC did not cause another FEIS to be prepared on the applications. All of the same issues that plaintiffs contend have been inadequately considered in the environmental assessment and by DRBC were considered when DRBC, after presentation of prior environmental impact statements, added the Point Pleasant pumping station to the Comprehensive Plan with a proposed maximum water withdrawal of 150 mgd. It is difficult to conjure up some valid reason to conclude that a reduction in the amount of water to be withdrawn from a maximum of 150 mgd to 95 mgd would have some additional adverse environmental impact not previously considered or would constitute such a changed circumstance as to require a new and additional FEIS, especially since plaintiffs appear to assert that the quantity of the water to be withdrawn is the root cause of most of the anticipated adverse environmental impacts.

The logic of plaintiffs' arguments, if accepted, would seem to require that whenever a § 3.8 application to construct a facility is made to DRBC, a new and full FEIS must be prepared as to its effect on the entire Delaware River Basin. It is difficult to conceive of any project subject to DRBC jurisdiction that would not have some environmental impact on most, if not all, of the basin water system, upstream as well as downstream. Where, as here, the § 3.8 application merely supplies added details to a portion of the already approved Comprehensive Plan and where, as here, the DRBC reasonably concludes on the basis of all its prior studies and an up-to-date comprehensive environmental assessment that the application, if granted, will cause no significant additional adverse environmental impacts over those arising from the then existing and approved Comprehensive Plan, there is no need or justification for requiring a new FEIS.

Plaintiffs contend that there are several, or indeed perhaps many, on-going, incomplete studies, which, when completed may expose other substantial changes and/or highlight possible environmental problems not previously considered. Among such studies is the Delaware River Basin Comprehensive (Level B) study. At the hearing on the present motion, there was provided to the court a published document: "The Delaware River Basin—The Final Report and Environmental Impact Statement of the Level B Study—May 1981. The Delaware River Basin Commission." Thus this study, another environmental impact statement, has been completed.[26] No suggestion has been made as to how or why this study should or would alter the decision as to the approval of the § 3.8 applications in the present litigation. My own admittedly somewhat cursory examination of this 140 page printed document containing voluminous charts and cross-references, fails to disclose any new significant information not available to or considered by DRBC when it granted the § 3.8 applications. The Level B study expressly provides and plans for a pumping station at Point Pleasant to withdraw a maximum of 95 mgd for division between Limerick and the North Branch Water Treatment Plant at Chal-

charged with this decision, and it, not this court, has the necessary expertise to make that determination. It is clear from the record that DRBC was well aware of the problem, carefully considered it, and had, through various studies and documents, been provided with voluminous information and data, and was fully informed.

26. Apparently the Study has not yet been formally approved and adopted by DRBC.

font.[27] The information contained in the study was likewise substantially available to DRBC and its staff during consideration of the present § 3.8 applications.

Plaintiffs suggest that no action should be taken until there is some final resolution of the so-called "good faith negotiations" by the States of New York, New Jersey, Pennsylvania and Delaware, engendered by the 1954 decree of the United States Supreme Court in *New Jersey v. New York, supra.* These negotiations have been continuing for many years. There is no certainty or assurance when, if ever, there will be any agreement as to a change in the Supreme Court decree. To suggest that these § 3.8 applications (and presumedly all other such applications or revisions to the Comprehensive Plan), which scale down previously approved plans for water use from the Point Pleasant pumping station, should be suspended or indefinitely delayed in the vague hope that the four involved states will resolve amicably a readjustment of water withdrawals and allocations, is unrealistic. It would completely defeat and stifle the purposes and direct mandate of the Compact to "develop and adopt . . . a comprehensive plan for the immediate and long range use of water resources of the basin" which DRBC "may from time to time review and revise." (Compact § 13.1).

The difficulty with plaintiffs' position, from a purely practical viewpoint is, that there have been, are now, and undoubtedly will continue to be for an indefinite number of future years, continuing studies by DRBC and other governmental and private agencies concerning all aspects of the Delaware River and utilization of the waters of this great natural resource. Many studies overlap each other both as to time span, content and agencies involved. The situation will never be fixed or static. There will always be population changes, varying needs and demands for water and continuing industrial, commercial and residential relocations. The whole concept of the Compact compels DRBC to make continuous study of both immediate and long range needs and "from time to time review and revise" the Comprehensive Plan in order to meet the needs of the basin. If plaintiffs' suggestions are adopted, it is quite apparent that it would be virtually impossible to ever amend the Comprehensive Plan or approve the construction of any substantial projects because of incompleted on-going studies.

NEPA intends that governmental agencies give serious consideration to the environmental consequences of proposed actions, and insofar as "practical" to minimize adverse impacts when action is taken. Undoubtedly such consideration does cause considerable delay while the agencies take that "hard look" that is referred to in the case law. However, NEPA was never intended to preclude all governmental action that might have some adverse environmental impacts.

█ NEPA does not by its express wording preclude federal actions that have adverse environmental impacts, nor does it attempt to quantify the severity of adverse environmental impacts that may be imposed by governmental action.[28] The specific procedural requirements of NEPA assume only that those governmental officials who must make the final decisions on federal actions, before making a decision, take a good faith, hard, objective look at the adverse environmental impacts and consequences of such action to determine whether to proceed and whether the action will be consistent with the national policy expressed in NEPA. *Committee for Auto Responsibility v. Solomon,* 603 F.2d 992, 1002 (D.C.Cir.1979), *cert. denied,* 445 U.S. 915, 100 S.Ct. 1274, 63 L.Ed.2d 599 (1980);[29] *Life of the Land v.*

---

27. Level B, FEIS at 44.

28. The National Environmental Policy declared by Congress in 42 U.S.C. § 4331 requires that the continuing policy of the Federal Government must, *inter alia*, be to "use all practical means and measures . . . to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans."

29. But see also in the cited case that the determination by an agency to proceed without an EIS "is judicially vulnerable only when the agency has abused its discretion or has acted

*Brinegar*, 485 F.2d 460 (9th Cir. 1973), *cert. denied*, 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974); *Ventling v. Bergland*, 479 F.Supp. 174 (D.S.D.), *aff'd*, 615 F.2d 1365 (8th Cir. 1979); *Sierra Club v. Cavanaugh*, 447 F.Supp. 427 (D.S.D.1978); *National Rifle Association of America, Inc. v. Kleppe*, 425 F.Supp. 1101 (D.D.C.1976), *aff'd sub nom. National Rifle Association of America, Inc. v. Andrus*, 571 F.2d 674 (D.C. Cir.1978).

### Insufficient Public Participation.

Plaintiffs contend that there was insufficient public participation, and more particularly that some information available to DRBC was not available to the public for comment. NEPA does not require a public hearing prior to a determination that no environmental impact statement is necessary.[30] There were, however, two public hearings and the final environmental assessment considers in great detail the public comments. (FEA—Part IV—1 through 101, inclusive. "DRBC Staff Responses to Issues Raised In Letters Received . . .").

The record makes clear that any and all information available to DRBC prior to its final action on the projects was available for inspection at DRBC's offices. Plaintiffs seem to take the position that all such information should have been contained in a single document, such as the FEA and that incorporation by reference and cross-references in the FEA are not part of the FEA. I know of no such legal requirement. It would require a monumental and useless compilation of paper work. NEPA Regulations, Part II, § 1500.4 and § 1502.21 expressly provide for "incorporating by reference" in preparing EIS's. All cross-referenced material was available for public inspection at DRBC headquarters.

█ In particular, plaintiffs object to the fact that DRBC received a letter from the Environmental Protective Agency (EPA),

dated February 17, 1981, in which letter the EPA changed its earlier position that DRBC should prepare another FEIS on the pending § 3.8 applications, and agreed by a letter to the federal member of DRBC that the determination of DRBC to proceed by way of issuing a "negative declaration" was proper. Counsel have referred to no statute, regulation or case law supporting the contention that every time an agency receives some important supplemental information, the agency must notify the public and afford the public and/or interested parties an opportunity for further comment. The obvious effect of such a procedural requirement would be to cause never-ending delay as there could be comments upon comments or information received from others, literally ad infinitum.

Plaintiffs contend that *Grazing Fields Farm v. Goldschmidt*, 626 F.2d 1068 (1st Cir. 1980), would require that the EPA letter of February 17, 1981, be contained in the FEA, and that the public would have to be allowed to comment on it. *Grazing Fields* was, of course, directly concerned only with information required to be contained in an FEIS. The case held that the alternatives must be set forth as part of the FEIS, and that failure to detail in the FEIS certain alternatives proposed by plaintiffs, even though such alternatives were apparent in the administrative record and were considered by the agency, required the preparation of an amended FEIS. The present case involves what must be contained in an FEA to serve as a proper predicate for a negative declaration. The letter of the EPA merely stated a changed opinion by EPA as to the necessity of DRBC preparing a new or updated FEIS. It contained no new or additional factual information concerning environmental impacts of the proposed projects.

arbitrarily," citing *Kleppe v. Sierra Club*, 427 U.S. 390, 412, 96 S.Ct. 2718, 2731, 49 L.Ed.2d 576 (1976), and other cases cited in n.40.

**30.** NEPA regulations contemplate public participation, and public hearings "whenever ap-

propriate." 40 C.F.R. § 1506.6. DRBC regulations require public notice prior to issuance of a "negative declaration." DRBC regulations, Article 4 § 2–4.5.

*Other Agencies and Statutes.*

Plaintiffs contend that DRBC did not adequately consider the opposition of the Pennsylvania Fish Commission and the concerns expressed by the U. S. Fish and Wildlife Service. The mere opposition to a proposed agency action by some private, or public organization, or a municipal, state or federal agency does not preclude federal action under NEPA, nor does such opposition mandate the preparation of an FEIS. Obviously such opposition should be considered by the agency before acting. Basically, the Pennsylvania Fish Commission has consistently opposed the removal of any additional water from the Delaware River. DRBC fully considered in detail in the Final Environmental Assessment the effect on fish life and aquatic biota. (See FEA—IV at 23 through 44 inclusive, "Impact on Aquatic Biota"), including public comments. (See also FEA 2–37; 2–41; 2–43; 2–45; 2–52; 2–55).

The Court has very recently been advised by counsel for DRBC that the National Fisheries Service of the Department of Commerce, for the first time, on or about June 24, 1981, expressed concern about the shortnose sturgeon which is apparently one of the listed endangered species.

In conformity with Section 7 of the Endangered Species Act of 1973, 16 U.S.C. § 1536, DRBC consulted with the National Fisheries Service and submitted in 1980 information for review by the National Fisheries Service on the effects of the proposed project on aquatic biota and environment. At that time, apparently neither DRBC nor the National Fisheries Service had any information suggesting the likelihood of any shortnose sturgeon existing in the area of Point Pleasant.

Recently, the National Fisheries Service received a report, apparently not confirmed, that during April of 1981, a dozen shortnose sturgeon were captured in a seine net above the Delaware River wing dam at Lambertville, New Jersey. Thus, if the report is accurate, shortnose sturgeon may possibly "utilize" portions of the Delaware River in the vicinity of Point Pleasant.[31]

No determination has been made that the proposed project would in any way jeopardize the continued existence of such species if it utilizes the river in the area of the intake facility, or that the project would result in the destruction or modification of the habitat of such species.

The concern expressed by the National Fisheries Service arose by reason of events occurring several months after DRBC action was taken, despite DRBC complying with all statutory and regulatory requirements. The concern appears to be primarily as to the design and construction of the intake facility. This facility is presently being studied by the Corps of Engineers and requires permit approval by the Corps of Engineers, as well as final approval by the Executive Director of DRBC.

I conclude that this information should not affect the validity of the "negative declaration" and the § 3.8 approvals granted by DRBC, being information obtained wholly after the action by DRBC was concluded. In any event, the Corps of Engineers will be required to assess this latest information, and NRC may also consider it in preparing an FEIS for an operating permit.

Plaintiffs have made claims that the action taken by DRBC violates the National Wild and Scenic Rivers Act, 16 U.S.C. §§ 1271, *et seq.* However, the record discloses that at least that portion of the Delaware River located in the vicinity of Point Pleasant and downstream therefrom is not now, and never has been, designated through the intricate statutory scheme, as eligible for inclusion within the National Wild and Scenic Rivers System, and that all required notices were given by DRBC to any agencies involved in the administration of the statute.

---

**31.** A standard road map indicates that Point Pleasant is approximately 6 to 8 miles upstream from Lambertville.

The original complaint asserts that DRBC failed to adequately consider at least sixty-two factors (Complaint ¶ 240 at 64–68 inclusive), twenty-two changed circumstances since the 1973 FEIS (Complaint ¶ 270 at 74–80 inclusive), and failure to comply with one or more procedural or substantive requirements of approximately eleven Acts of Congress (Complaint ¶ 2 at 5). The original complaint is ninety-nine pages in length. A ten-page amended complaint was filed which incorporates the original complaint by reference and adds additional asserted errors or irregularities in the DRBC proceedings and action. In reviewing all of these contentions, it appears that DRBC had information concerning, was aware of and did adequately consider the itemized "factors," contained in the complaint, and complied with all statutory mandates. In this opinion I have discussed only those issues upon which plaintiffs appear to be primarily relying, but all of the contentions have been considered even though not specifically articulated.

The brief of one of the parties suggested that plaintiffs were adopting a so-called "shot gun" approach. Whether or not such a characterization is appropriate, plaintiffs clearly have the right to raise every issue, procedural and substantive, that may bear on the ultimate question of the validity of the DRBC's approval of the § 3.8 applications of NWRA and PECO. Because NEPA is primarily a procedural statute, it is necessary that the mandated statutory procedures of NEPA and the several allied statutes such as "The Endangered Species Act," 16 U.S.C. § 1531 *et seq.*, and "The Wild and Scenic Rivers Act," 16 U.S.C. § 1271 *et seq.*, be carried out. So far as I have been able to ascertain from the great quantity of documents presented, DRBC has fully complied with the requirements of the law.

Subsequent to the hearing, plaintiffs filed a motion seeking leave to "expand the record" by submitting additional documents.

Although defendants oppose the motion, a consideration of these "submissions" presents nothing additional that would affect the outcome of my decision.

The "submission" includes what plaintiffs denominate as "newly discovered documents." It includes a preliminary environmental assessment and related Section 404 analysis of the Point Pleasant water diversion plan, prepared by a private engineering firm, apparently under a contract with the United States Corps of Engineers, with respect to the intake facility in the Delaware River and the rechannelization of a small portion of the Pine Run at Chalfont.

The study briefly reviews the development of the project beginning in the early 1960's. It refers to a total of six environmental assessments and impact statements covering "significant portions of the project," as well as "many secondary sources" of information.[32] The report was based entirely "on existing environmental documents about the project," which were deemed to be fully adequate to consider all environmental concerns.[33] The report states that "[o]ver the last ten years, literally thousands of pages of environmental reports have been prepared on various components of the proposed project." [34]

My analysis of this preliminary environmental assessment fails to reveal any new or additional information, and, indeed, since it is based entirely on existing documents, new information would not be expected. The document suggests various areas of further study which the Corps of Engineers should make before acting upon approvals which PECO and NWRA will need from the Corps of Engineers.

It is apparent from this preliminary report, that the Corps of Engineers may require the preparation of another FEIS. NRC has publicly announced that it will require an FEIS prior to granting PECO an operating license for Limerick. If plaintiffs contentions would be upheld, it is entirely likely that there would be prepared simulta-

32. Appendix I at 3 and 4 of the "Submission."

33. Appendix I at vii of the "Submission."

34. Appendix I at 13 of the "Submission."

neously but independently, three separate environmental impact statements by three separate federal agencies, in order to obtain final approval of projects that have already previously been the subject of at least three environmental impact statements and have been by proper prior action, fully approved, at least in general concept. I do not think that Congress ever intended to so burden federal action with interminable study upon study.

*Express Conditions to § 3.8 Approvals.*

The § 3.8 approvals were subject to important express conditions that provide assurance that adverse environmental impacts will be minimized during the construction and in the ultimate operation of the facilities. These include, *inter alia*, that operations by both NWRA and PECO must at all times comply with all DRBC requirements, which would include any properly adopted DRBC drought or flood emergency regulations. The maximum withdrawals are expressly limited, with the additional requirement that certain minimum flowages be maintained in the North Branch of the Neshaminy Creek by NWRA and the East Branch of the Perkiomen by PECO. The intake facilities must "equal or surpass EPA approved intake design criteria," and final design of the intake facility is subject to Corps of Engineers and DRBC approval. All required approvals and permits from other appropriate state, federal and local governmental agencies must be obtained, including the Corps of Engineers which is presently reviewing the permit applications. NWRA must continually monitor and make a bi-annual report to DRBC concerning ecological changes, with the retained right of DRBC to "curtail or suspend" the operation of the project if significant ecological impacts degrade the North Branch. The Executive Director of DRBC is to have continuing authority to regulate the operation of the NWRA project as the designated "Stream Master." As to PECO's Limerick project, DRBC retains the right to reopen and reconsider its approval at any time.

Finally the Compact itself provides that the President may modify the Comprehensive Plan in the national interest. Compact § 15.1(s) provides, in part:

> *Provided further,* That whenever the President shall find and determine that the national interest so requires, he may suspend, modify or delete any provision of the comprehensive plan to the extent that it affects the exercise of any powers, rights, functions, or jurisdiction conferred by law on any officer, agency or instrumentality of the United States other than the commission. Such action shall be taken by executive order in which such finding and determination shall be set forth.

Although plaintiffs contend that the public was never afforded an opportunity to comment upon the express restrictions imposed by DRBC in granting the § 3.8 applications, it is obvious that those restrictions were imposed, partially at least, in response to expressed concerns as to adverse environmental impacts of the projects. These additional restrictions can in no practical respect, prejudice plaintiffs or the public, although plaintiffs might well have suggested imposing more stringent requirements.

I do not understand any party to this litigation to contend that the proposed water diversion plan never required an environmental impact statement prior to DRBC approval. Nor do I understand defendants to contend that an FEIS, once prepared, concludes for all time the necessity of preparing an updated FEIS, when there is a significant lapse of time between the preparation of an FEIS and the DRBC approval and/or substantial change in circumstances that would increase adverse environmental effects.

### Conclusion.

██ The record in this case makes four matters quite obvious. First, there have been at least three prior FEIS's on the basic plan and concept, all of which were available and considered by DRBC.[35] Second, the project has been under constant study and

---

**35.** With the Level B study, there have been at least four FEIS's prepared.

updating of factual information from the plan's inception to the present time, and indeed is subject to ongoing studies.[36] Third, the only substantial change from heretofore approved plans based on prior environmental impact statements and other studies, is a substantial reduction in the quantity of water to be withdrawn for NWRA's water treatment plant. Fourth, the environmental assessment prepared is detailed, up-to-date and adequately considers any changed circumstances.

Under the circumstances of this case, the decision of DRBC approving the § 3.8 applications of NWRA and PECO by way of a "negative declaration" and without preparing another FEIS was not "arbitrary, capricious or an abuse of discretion," (*Kleppe v. Sierra Club, supra*), but was a "reasonable" determination based upon the facts presented to it.

■ The decision that an updated environmental impact statement was not required is clearly reviewable by the courts to the extent that the action comes within the requirements of NEPA. As stated by Chief Judge Seitz in *Shiffler v. Schlesinger*, 548 F.2d 96, 101 (3d Cir. 1977):

> Even if we did not regard SCRAP II as dispositive, we conclude that a negative EIS decision is clearly reviewable when § 102(2)(C) is considered under the standards announced in *Citizens To Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) and *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). We agree with those courts which have said that Congress could hardly have provided a clearer or stronger mandate to the courts in § 102(2)(C). *E.g., Calvert Cliffs' Coordinating Committee, Inc. v. A. E. C.*, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1115 (1971).

Such a review, however, does not permit a district judge, or any other judge, to substitute his or her judgment as what is in the best public interest, or the course of action that will best comply with the spirit of NEPA, for the judgment of the federal agency having by law the responsibility for making such a decision. Where there are strong competing but countervailing interests involved, there will always be those who sincerely and perhaps correctly conclude that the decision of the responsible administrative agency is wrong. Often those who find fault with such a decision will seek a reversal of that decision through the judicial system. To allow judges to substitute their inexpert judgment in the subject matter for the—at least supposed and hoped for—expert judgment of agencies who by law are to decide these difficult questions, would undoubtedly prove in the long run far less satisfactory. For this reason, judicial review is properly limited.

The question is not whether the projects themselves will have some significant adverse environmental impact, but whether the changes in the projects heretofore approved will have some significant adverse environmental impact not previously considered. Regardless of how strict a standard of review is applied, the decision to proceed without another environmental impact statement was legally valid and proper. DRBC's action was reasonable; it was based upon a full consideration of facts and circumstances of the case; it was done with deliberation and not in an arbitrary or capricious manner, and to the extent that DRBC was vested with any discretion in deciding to proceed by way of a "negative declaration," there was no abuse of discretion. The record establishes that DRBC complied with all challenged statutory and regulatory requirements.

Therefore, the action of DRBC in granting the § 3.8 application of PECO and NWRA will be affirmed and judgment will be entered in favor of the defendants.

---

**36.** Plaintiffs seem to contend that until *all* ongoing and proposed or potential studies are completed, no action should be taken by DRBC. *See supra.*